# CARGILL, INC., ET AL. *v.* MONFORT OF COLORADO, INC.

No. 85–473.   Argued October 6, 1986—Decided December 9, 1986

BRENNAN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, POWELL, O'CONNOR, and SCALIA, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 122. BLACKMUN, J., took no part in the consideration or decision of the case.

*Ronald G. Carr* argued the cause for petitioners. With him on the briefs were *Robert F. Hanley, Alan K. Palmer,* and *Phillip Areeda.*

*Deputy Solicitor General Cohen* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Ginsburg, Deputy Assistant Attorney General Cannon, Jerrold J. Ganzfried, Catherine G. O'Sullivan, Andrea Limmer,* and *Marcy J. K. Tiffany.*

*William C. McClearn* argued the cause for respondent. With him on the brief were *James E. Hartley, Elizabeth A. Phelan,* and *Marcy G. Glenn.* *

JUSTICE BRENNAN delivered the opinion of the Court.

Under § 16 of the Clayton Act, 38 Stat. 737, as amended, 15 U. S. C. § 26, private parties "threatened [with] loss or damage by a violation of the antitrust laws" may seek injunctive relief. This case presents two questions: whether a plaintiff seeking relief under § 16 must prove a threat of antitrust injury, and, if so, whether loss or damage due to increased competition constitutes such injury.

———

*Thomas B. Leary* filed a brief for the Business Roundtable as *amicus curiae* urging reversal.

*David L. Foster* and *Kim Sperduto* filed a brief for Royal Crown Cola Co. as *amicus curiae.*

## I

Respondent Monfort of Colorado, Inc. (Monfort), the plaintiff below, owns and operates three integrated beef-packing plants, that is, plants for both the slaughter of cattle and the fabrication of beef.[1] Monfort operates in both the market for fed cattle (the input market) and the market for fabricated beef (the output market). These markets are highly competitive, and the profit margins of the major beef packers are low. The current markets are a product of two decades of intense competition, during which time packers with modern integrated plants have gradually displaced packers with separate slaughter and fabrication plants.

Monfort is the country's fifth-largest beef packer. Petitioner Excel Corporation (Excel), one of the two defendants below, is the second-largest packer. Excel operates five integrated plants and one fabrication plant. It is a wholly owned subsidiary of Cargill, Inc., the other defendant below, a large privately owned corporation with more than 150 subsidiaries in at least 35 countries.

On June 17, 1983, Excel signed an agreement to acquire the third-largest packer in the market, Spencer Beef, a division of the Land O'Lakes agricultural cooperative. Spencer Beef owned two integrated plants and one slaughtering plant. After the acquisition, Excel would still be the second-largest packer, but would command a market share almost equal to that of the largest packer, IBP, Inc. (IBP).[2]

---

[1] As the District Court explained, " '[f]abrication' is the process whereby the carcass is broken down into either whole cuts (referred to as 'primals', 'subprimals' and 'portions') or ground beef." 591 F. Supp. 683, 690 (Colo. 1983). Whole cuts that are then vacuum packed before shipment are called "boxed beef"; the District Court found that "80% of all beef received at the retail supermarket level and at the hotel, restaurant, and institutional ('HRI') level" is boxed beef. *Ibid.*

[2] The District Court relied on the testimony of one of Monfort's witnesses in determining market share. *Id.*, at 706–707. According to this testimony, Monfort's share of the cattle slaughter market was 5.5%, Excel's share was 13.3%, and IBP's was 24.4%. 1 App. 69. Monfort's

Monfort brought an action under § 16 of the Clayton Act, 15 U. S. C. § 26, to enjoin the prospective merger.[3]   Its complaint alleged that the acquisition would "violat[e] Section 7 of the Clayton Act because the effect of the proposed acquisition may be substantially to lessen competition or tend to create a monopoly in several different ways . . . ."   1 App. 19.   Monfort described the injury that it allegedly would suffer in this way:

> "(f) *Impairment of plaintiff's ability to compete.* The proposed acquisition will result in a concentration of economic power in the relevant markets which threatens Monfort's supply of fed cattle and its ability to compete in the boxed beef market."   *Id.,* at 20.

Upon agreement of the parties, the District Court consolidated the motion for a preliminary injunction with a full trial

---

share of the production market was 5.7%, Excel's share was 14.1%, and IBP's share was 27.3%.   *Id.,* at 64.   After the merger, Excel's share of each market would increase to 20.4%.   *Id.,* at 64, 69; 761 F. 2d 570, 577 (CA10 1985).

[3] Section 16 states:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided,* That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of subtitle IV of title 49, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission.   In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff."   15 U. S. C. § 26.

on the merits. On the second day of trial, Excel moved for involuntary dismissal on the ground, *inter alia*, that Monfort had failed to allege or show that it would suffer antitrust injury as defined in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977). The District Court denied the motion. After the trial, the court entered a memorandum opinion and order enjoining the proposed merger. The court held that Monfort's allegation of "price-cost 'squeeze'" that would "severely narro[w]" Monfort's profit margins constituted an allegation of antitrust injury. 591 F. Supp. 683, 691–692 (Colo. 1983). It also held that Monfort had shown that the proposed merger would cause this profit squeeze to occur, and that the merger violated § 7 of the Clayton Act.[4] *Id.*, at 709–710.

On appeal, Excel argued that an allegation of lost profits due to a "price-cost squeeze" was nothing more than an allegation of losses due to vigorous competition, and that losses from competition do not constitute antitrust injury. It also argued that the District Court erred in analyzing the facts relevant to the § 7 inquiry. The Court of Appeals affirmed the judgment in all respects. It held that Monfort's allegation of a "price-cost squeeze" was not simply an allegation of injury from competition; in its view, the alleged "price-cost squeeze" was a claim that Monfort would be injured by what the Court of Appeals "consider[ed] to be a form of predatory pricing in which Excel will drive other companies out of the market by paying more to its cattle suppliers and charging less for boxed beef that it sells to institutional buyers and consumers." 761 F. 2d 570, 575 (CA10 1985). On the § 7 issue, the Court of Appeals held that the District Court's decision was not clearly erroneous. We granted certiorari, 474 U. S. 1049 (1985).

[4] Section 7 prohibits mergers when the "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly," 15 U. S. C. § 18.

## II

This case requires us to decide, at the outset, a question we have not previously addressed: whether a private plaintiff seeking an injunction under § 16 of the Clayton Act must show a threat of antitrust injury. To decide the question, we must look first to the source of the antitrust injury requirement, which lies in a related provision of the Clayton Act, § 4, 15 U. S. C. § 15.

Like § 16, § 4 provides a vehicle for private enforcement of the antitrust laws. Under § 4, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . , and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15. In *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc., supra,* we held that plaintiffs seeking treble damages under § 4 must show more than simply an "injury causally linked" to a particular merger; instead, "plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.,* at 489 (emphasis in original). The plaintiffs in *Brunswick* did not prove such injury. The plaintiffs were 3 of the 10 bowling centers owned by a relatively small bowling chain. The defendant, one of the two largest bowling chains in the country, acquired several bowling centers located in the plaintiffs' market that would have gone out of business but for the acquisition. The plaintiffs sought treble damages under § 4, alleging as injury "the loss of income that would have accrued had the acquired centers gone bankrupt" and had competition in their markets consequently been reduced. *Id.,* at 487. We held that this injury, although causally related to a merger alleged to violate § 7, was not an antitrust injury, since "[i]t is inimical to [the antitrust] laws to award damages" for losses stem-

ming from continued competition. *Id.*, at 488. This reasoning in *Brunswick* was consistent with the principle that "the antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors.*'" *Ibid.*, quoting *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 320 (1962) (emphasis in original).

Subsequent decisions confirmed the importance of showing antitrust injury under § 4. In *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465 (1982), we found that a health-plan subscriber suffered antitrust injury as a result of the plan's "purposefully *anticompetitive scheme*" to reduce competition for psychotherapeutic services by reimbursing subscribers for services provided by psychiatrists but not for services provided by psychologists. *Id.*, at 483. We noted that antitrust injury, "as analyzed in *Brunswick*, is one factor to be considered in determining the redressability of a particular form of injury under § 4," *id.*, at 483, n. 19, and found it "plain that McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." *Id.*, at 483. Similarly, in *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519 (1983), we applied "the *Brunswick* test," and found that the petitioner had failed to allege antitrust injury. *Id.*, at 539–540.[5]

Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss

---

[5] A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons. See generally Page, The Scope of Liability for Antitrust Violations, 37 Stan. L. Rev. 1445, 1483–1485 (1985) (distinguishing concepts of antitrust injury and antitrust standing). Thus, in *Associated General Contractors* we considered other factors in addition to antitrust injury to determine whether the petitioner was a proper plaintiff under § 4. 459 U. S., at 540. As we explain, n. 6, *infra*, however, many of these other factors are not relevant to the standing inquiry under § 16.

or damage by a violation of the antitrust laws . . . ." 15 U. S. C. § 26. It is plain that § 16 and § 4 do differ in various ways. For example, § 4 requires a plaintiff to show actual injury, but § 16 requires a showing only of "threatened" loss or damage; similarly, § 4 requires a showing of injury to "business or property," cf. *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251 (1972), while § 16 contains no such limitation.[6] Although these differences do affect the nature of the injury cognizable under each section, the lower courts, including the courts below, have found that under both § 16 and § 4 the plaintiff must still allege an injury of the type the antitrust laws were designed to prevent.[7] We agree.

---

[6] Standing analysis under § 16 will not always be identical to standing analysis under § 4. For example, the difference in the remedy each section provides means that certain considerations relevant to a determination of standing under § 4 are not relevant under § 16. The treble-damages remedy, if afforded to "every person tangentially affected by an antitrust violation," *Blue Shield of Virginia* v. *McCready*, 457 U. S. 465, 476–477 (1982), or for "all injuries that might conceivably be traced to an antitrust violation," *Hawaii* v. *Standard Oil Co.*, 405 U. S., at 263, n. 14, would "open the door to duplicative recoveries," *id.*, at 264, and to multiple lawsuits. In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4. See *Associated General Contractors*, 459 U. S., at 544–545; *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977). Conversely, under § 16, the only remedy available is equitable in nature, and, as we recognized in *Hawaii* v. *Standard Oil Co.*, "the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one." 405 U. S., at 261. Thus, because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.

[7] See *Ball Memorial Hospital, Inc.* v. *Mutual Hospital Insurance, Inc.*, 784 F. 2d 1325, 1334 (CA7 1986); *Midwest Communications, Inc.* v. *Minnesota Twins, Inc.*, 779 F. 2d 444, 452–453 (CA8 1985), cert. denied, 476 U. S. 1163 (1986); *Christian Schmidt Brewing Co.* v. *G. Heileman Brewing Co.*, 753 F. 2d 1354, 1358 (CA6), cert. dism'd, 469 U. S. 1200

The wording concerning the relationship of the injury to the violation of the antitrust laws in each section is comparable. Section 4 requires proof of injury "by reason of anything forbidden in the antitrust laws"; § 16 requires proof of "threatened loss or damage by a violation of the antitrust laws." It would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred.

There is no indication that Congress intended such a result. Indeed, the legislative history of § 16 is consistent with the view that § 16 affords private plaintiffs injunctive relief only for those injuries cognizable under § 4. According to the House Report:

> "Under section 7 of the act of July 2, 1890 [revised and incorporated into Clayton Act as § 4], a person injured in his business and property by corporations or combinations acting in violation of the Sherman antitrust law, may recover loss and damage for such wrongful act. There is, however, no provision in the existing law authorizing a person, firm, corporation, or association to enjoin threatened loss or damage to his business or property by the commission of *such unlawful acts, and the purpose of this section is to remedy such defect in the law*." H. R. Rep. No. 627, 63d Cong., 2d Sess., pt. 1, p. 21 (1914) (emphasis added).[8]

(1985); *Schoenkopf* v. *Brown & Williamson Tobacco Corp.*, 637 F. 2d 205, 210–211 (CA3 1980).

[8] See also S. Rep. No. 698, 63d Cong., 2d Sess., pt. 2, pp. 17–18, 50 (1914). Although the references to § 16 in the debates on the passage of the Clayton Act are scarce, those that were made are consistent with the House and Senate Reports. For example, in this excerpt from a provision-by-provision description of the bill, Representative McGillicuddy (a member of the House Judiciary Committee) stated:

"Under the present law any person injured in his business or property by acts in violation of the Sherman antitrust law may recover his damage. In fact, under the provisions of the law he is entitled to recover threefold damage whenever he is able to prove his case. There is no provision

Sections 4 and 16 are thus best understood as providing complementary remedies for a single set of injuries.   Accordingly, we conclude that in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U. S., at 489.   We therefore turn to the question whether the proposed merger in this case threatened respondent with antitrust injury.

### III

Initially, we confront the problem of determining what Monfort alleged the source of its injury to be.   Monfort's complaint is of little assistance in this regard, since the injury

---

under the present law, however, to prevent threatened loss or damage even though it be irreparable.   The practical effect of this is that a man would have to sit by and see his business ruined before he could take advantage of his remedy.   In what condition is such a man to take up a long and costly lawsuit to defend his rights?

"The proposed bill solves this problem for the person, firm, or corporation threatened with loss or damage to property by *providing injunctive relief against the threatened act that will cause such loss or damage.* Under this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy.   Thus the bill not only protects the individual from loss or damage, but it relieves him of the tremendous burden of long and expensive litigation, often intolerable." 51 Cong. Rec. 9261 (1914) (emphasis added).

Representative Floyd described the nature of the § 16 remedy in these terms:

"In section 16 . . . is a provision that gives the litigant injured in his business an entirely new remedy.

.    .    .    .    .

". . . [S]ection 16 gives any individual, company, or corporation . . . or combination the right to go into court and enjoin the doing of these unlawful acts, instead of having to wait until the act is done and the business destroyed and then sue for damages. . . . [S]o that if a man is injured by a discriminatory contract, by a tying contract, by the unlawful acquisition of stock of competing corporations, or by reason of someone acting unlawfully as a director in two banks or other corporations, he can go into court and enjoin and restrain the party from committing such unlawful acts." *Id.*, at 16319.

alleged therein—"an impairment of plaintiff's ability to compete"—is alleged to result from "a concentration of economic power." 1 App. 19. The pretrial order largely restates these general allegations. Record 37. At trial, however, Monfort did present testimony and other evidence that helped define the threatened loss. Monfort alleged that after the merger, Excel would attempt to increase its market share at the expense of smaller rivals, such as Monfort. To that end, Monfort claimed, Excel would bid up the price it would pay for cattle, and reduce the price at which it sold boxed beef. Although such a strategy, which Monfort labeled a "price-cost squeeze," would reduce Excel's profits, Excel's parent corporation had the financial reserves to enable Excel to pursue such a strategy. Eventually, according to Monfort, smaller competitors lacking significant reserves and unable to match Excel's prices would be driven from the market; at this point Excel would raise the price of its boxed beef to supracompetitive levels, and would more than recoup the profits it lost during the initial phase. 591 F. Supp., at 691–692.

From this scenario two theories of injury to Monfort emerge: (1) a threat of a loss of profits stemming from the possibility that Excel, after the merger, would lower its prices to a level at or only slightly above its costs; (2) a threat of being driven out of business by the possibility that Excel, after the merger, would lower its prices to a level below its costs.[9] We discuss each theory in turn.

## A

Monfort's first claim is that after the merger, Excel would lower its prices to some level at or slightly above its costs in order to compete with other packers for market share.

---

[9] In its brief, Monfort also argues that it would be injured by "the trend toward oligopoly pricing" that could conceivably follow the merger. Brief for Respondent 18–20. There is no indication in the record that this claim was raised below, however, and so we do not address it here.

Excel would be in a position to do this because of the multi-plant efficiencies its acquisition of Spencer would provide, 1 App. 74–75, 369–370. To remain competitive, Monfort would have to lower its prices; as a result, Monfort would suffer a loss in profitability, but would not be driven out of business.[10] The question is whether Monfort's loss of profits in such circumstances constitutes antitrust injury.

To resolve the question, we look again to *Brunswick* v. *Pueblo Bowl-O-Mat, supra*. In *Brunswick*, we evaluated the antitrust significance of several competitors' loss of profits resulting from the entry of a large firm into its market. We concluded:

> "[T]he antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for 'the protection of *competition*, not *competitors*,' *Brown Shoe Co.* v. *United States*, 370 U. S., at 320. It is inimical to the purposes of these laws to award damages for the type of injury claimed here." *Id.*, at 488.

The loss of profits to the competitors in *Brunswick* was not of concern under the antitrust laws, since it resulted only from continued competition. Respondent argues that the losses in *Brunswick* can be distinguished from the losses alleged here, since the latter will result from an increase, rather than from a mere continuation, of competition. The range of ac-

---

[10] In this case, Monfort has conceded that its viability would not be threatened by Excel's decision to lower prices: "Because Monfort's operations were as efficient as those of Excel, only below-cost pricing could remove Monfort as an obstacle." *Id.*, at 11–12; see also *id.*, at 5, and n. 6 ("Monfort proved it was just as efficient as Excel"); *id.*, at 18; 761 F. 2d, at 576 ("Monfort would only be harmed by sustained predatory pricing").

tions unlawful under § 7 of the Clayton Act is broad enough, respondent claims, to support a finding of antitrust injury whenever a competitor is faced with a threat of losses from increased competition.[11] We find respondent's proposed construction of § 7 too broad, for reasons that *Brunswick* illustrates. *Brunswick* holds that the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws. The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition. To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." *Arthur S. Langenderfer, Inc.* v. *S. E. Johnson Co.*, 729 F. 2d 1050, 1057 (CA6), cert. denied, 469 U. S. 1036 (1984). The logic of

---

[11] Respondent finds support in the legislative history of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 for the view that Congress intends the courts to apply § 7 so as to protect the viability of small competitors. The Senate Report, for example, cites with approval this Court's statement in *United States* v. *Von's Grocery Co.*, 384 U. S. 270, 275 (1966), that "the basic purpose of the 1950 Celler-Kefauver Act [amending § 7 of the Clayton Act] was to prevent economic concentration in the American economy by keeping a large number of small competitors in business." S. Rep. No. 94–803, p. 63 (1976). Even if respondent is correct that Congress intended the courts to apply § 7 so as to keep small competitors in business at the expense of efficiency, a proposition about which there is considerable disagreement, such congressional intent is of no use to Monfort, which has conceded that it will suffer only a loss of profits, and not be driven from the market, should Excel engage in a cost-price squeeze. See n. 10, *supra*.

*Brunswick* compels the conclusion that the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury.

## B

The second theory of injury argued here is that after the merger Excel would attempt to drive Monfort out of business by engaging in sustained predatory pricing. Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run.[12]  It is a prac-

---

[12] Most commentators reserve the term predatory pricing for pricing below some measure of cost, although they differ on the appropriate measure. See, *e. g.*, Areeda & Turner, Predatory Pricing and Related Practices under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697 (1975); McGee, Predatory Pricing Revisited, 23 J. Law & Econ. 289 (1980) (reviewing various proposed definitions). No consensus has yet been reached on the proper definition of predatory pricing in the antitrust context, however. For purposes of decision in *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574 (1986), for example, we defined predatory pricing as either "(i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Id.*, at 585, n. 8. Definitions of predatory pricing also vary among the Circuits. Compare *Arthur S. Langenderfer, Inc.* v. *S. E. Johnson Co.*, 729 F. 2d 1050, 1056–1057 (CA6) (pricing below marginal or average variable cost presumptively illegal, pricing above such cost presumptively legal), cert. denied, 469 U. S. 1036 (1984), with *Transamerica Computer Co.* v. *International Business Machines Corp.*, 698 F. 2d 1377 (CA9) (pricing above average total costs may be deemed predatory upon showing of predatory intent), cert. denied, 464 U. S. 955 (1983).

Although neither the District Court nor the Court of Appeals explicitly defined the term predatory pricing, their use of the term is consistent with a definition of pricing below cost. Such a definition is sufficient for purposes of this decision, because only below-cost pricing would threaten to drive Monfort from the market, see n. 9, *supra*, and because Monfort made no allegation that Excel would act with predatory intent. Thus, in this case, as in *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, *supra*, we find it unnecessary to "consider whether recovery should *ever* be available . . . when the pricing in question is above some measure of incre-

tice that harms both competitors *and* competition. In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition. Predatory pricing is thus a practice "inimical to the purposes of [the antitrust] laws," *Brunswick*, 429 U. S., at 488, and one capable of inflicting antitrust injury.[13]

The Court of Appeals held that Monfort had alleged "what we consider to be a form of predatory pricing . . . ." 761 F. 2d, at 575. The court also found that Monfort "could only be harmed by sustained predatory pricing," and that "it is impossible to tell in advance of the aquisition" whether Excel would in fact engage in such a course of conduct; because it could not rule out the possibility that Excel would engage in predatory pricing, it found that Monfort was threatened with antitrust injury. *Id.*, at 576.

Although the Court of Appeals did not explicitly define what it meant by predatory pricing, two interpretations are plausible. First, the court can be understood to mean that Monfort's allegation of losses from the above-cost "price-cost squeeze" was equivalent to an allegation of injury from predatory conduct. If this is the proper interpretation, then the court's judgment is clearly erroneous because (a) Monfort made no allegation that Excel would act with predatory intent after the merger, and (b) price competition is not predatory activity, for the reasons discussed in Part III–A, *supra*.

Second, the Court of Appeals can be understood to mean that Monfort had shown a credible threat of injury from below-cost pricing. To the extent the judgment rests on this ground, however, it must also be reversed, because Monfort

mental cost," 475 U. S., at 585, n. 9, or whether above-cost pricing coupled with predatory intent is ever sufficient to state a claim of predation. See n. 11, *supra*.

[13] See also *Brunswick*, 429 U. S., at 489, n. 14 ("The short-term effect of certain anticompetitive behavior—predatory below-cost pricing, for example—may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened").

did not allege injury from below-cost pricing before the District Court. The District Court twice noted that Monfort had made no assertion that Excel would engage in predatory pricing. See 591 F. Supp., at 691 ("Plaintiff does not contend that predatory practices would be engaged in by Excel or IBP"); *id.*, at 710 ("Monfort does not allege that IBP and Excel will in fact engage in predatory activities as part of the cost-price squeeze").[14] Monfort argues that there is evidence in the record to support its view that it did raise a claim of predatory pricing below. This evidence, however, consists only of four passing references, three in deposition testimony, to the possibility that Excel's prices might dip below costs. See 1 App. 276; 2 App. 626, 666, 669. Such references fall far short of establishing an allegation of injury from predatory pricing. We conclude that Monfort neither raised nor proved any claim of predatory pricing before the District Court.[15]

---

[14] The Court of Appeals may have relied on the District Court's speculation that the merger raised "a distinct possibility . . . of predatory pricing." 591 F. Supp., at 710. This statement directly followed the District Court's second observation that Monfort did not raise such a claim, however, and thus was clearly dicta.

[15] Even had Monfort actually advanced a claim of predatory pricing, we doubt whether the facts as found by the District Court would have supported it. Although Excel may have had the financial resources to absorb losses over an extended period, other factors, such as Excel's share of market capacity and the barriers to entry after competitors have been driven from the market, must also be considered.

In order to succeed in a sustained campaign of predatory pricing, a predator must be able to absorb the market shares of its rivals once prices have been cut. If it cannot do so, its attempt at predation will presumably fail, because there will remain in the market sufficient demand for the competitors' goods at a higher price, and the competitors will not be driven out of business. In this case, Excel's 20.4% market share after the merger suggests it would lack sufficient market power to engage in predatory pricing. See Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L. J. 284, 292 (1977) (60% share necessary); Areeda & Turner, Williamson on Predatory Pricing, 87 Yale L. J. 1337, 1348 (1978) (60% share not enough). It is possible that a firm with a low market share might nev-

## IV

In its *amicus* brief, the United States argues that the "danger of allowing a competitor to challenge an acquisi-

---

ertheless have sufficient excess capacity to enable it rapidly to expand its output and absorb the market shares of its rivals. According to Monfort's expert witness, however, Excel's postmerger share of market capacity would be only 28.4%. 1 App. 66. Moreover, it appears that Excel, like the other large beef packers, operates at over 85% of capacity. *Id.*, at 135–136. Thus Excel acting alone would clearly lack sufficient capacity after the merger to satisfy all or most of the demand for boxed beef. Although it is conceivable that Excel could act collusively with other large packers, such as IBP, in order to make the scheme work, the District Court found that Monfort did not "assert that Excel and IBP would act in collusion with each other in an effort to drive others out of the market," 591 F. Supp., at 692. With only a 28.4% share of market capacity and lacking a plan to collude, Excel would harm only itself by embarking on a sustained campaign of predatory pricing. Courts should not find allegations of predatory pricing credible when the alleged predator is incapable of successfully pursuing a predatory scheme. See n. 17, *infra*.

It is also important to examine the barriers to entry into the market, because "without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time." *Matsushita*, 475 U. S., at 591, n. 15. In discussing the potential for oligopoly pricing in the beef-packing business following the merger, the District Court found significant barriers to entry due to the "costs and delays" of building new plants, and "the lack of [available] facilities and the cost [$20–40 million] associated with refurbishing old facilities." 591 F. Supp., at 707–708. Although the District Court concluded that these barriers would restrict entry following the merger, the court's analysis was premised on market conditions during the premerger period of competitive pricing. *Ibid.* In evaluating entry barriers in the context of a predatory pricing claim, however, a court should focus on whether significant entry barriers would exist *after* the merged firm had eliminated some of its rivals, because at that point the remaining firms would begin to charge supracompetitive prices, and the barriers that existed during competitive conditions might well prove insignificant. In this case, for example, although costs of entry into the current competitive market may be high, if Excel and others in fact succeeded in driving competitors out of the market, the facilities of the bankrupt competitors would then be available, and the record shows, without apparent contradiction, that shut-down plants could be producing efficiently in a matter of months and that equipment and a labor force could

tion on the basis of necessarily speculative claims of post-acquisition predatory pricing far outweighs the danger that any anticompetitive merger will go unchallenged." Brief for United States as *Amicus Curiae* 25. On this basis, the United States invites the Court to adopt in effect a *per se* rule "denying competitors standing to challenge acquisitions on the basis of predatory pricing theories." *Id.*, at 10.

We decline the invitation. As the foregoing discussion makes plain, *supra*, at 117–118, predatory pricing is an anticompetitive practice forbidden by the antitrust laws. While firms may engage in the practice only infrequently, there is ample evidence suggesting that the practice does occur.[16] It would be novel indeed for a court to deny standing to a party seeking an injunction against threatened injury merely because such injuries rarely occur.[17] In any case, nothing in

---

readily be obtained, 1 App. 95–96. Similarly, although the District Court determined that the high costs of building new plants and refurbishing old plants created a "formidable" barrier to entry given "the low profit margins in the beef industry," 591 F. Supp., at 707, this finding speaks neither to the likelihood of entry during a period of supracompetitive profitability nor to the potential return on investment in such a period.

[16] See Koller, The Myth of Predatory Pricing: An Empirical Study, 4 Antitrust Law & Econ. Rev. 105 (1971); Miller, Comments on Baumol and Ordover, 28 J. Law & Econ. 267 (1985).

[17] Claims of threatened injury from predatory pricing must, of course, be evaluated with care. As we discussed in *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, the likelihood that predatory pricing will benefit the predator is "inherently uncertain: the short-run loss [from pricing below cost] is definite, but the long-run gain depends on successfully neutralizing the competition. . . . [and] on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." 475 U. S., at 589. Although the commentators disagree as to whether it is ever rational for a firm to engage in such conduct, it is plain that the obstacles to the successful execution of a strategy of predation are manifold, and that the disincentives to engage in such a strategy are accordingly numerous. See, *e. g.*, *id.*, at 588–593 (discussing obstacles to successful predatory pricing conspiracy); R. Bork, The Antitrust Paradox 144–159 (1978); McGee, Predatory Pricing Revisited, 23 J. Law & Econ., at 291–300; Posner, The Chicago School of Antitrust Analysis, 127

the language or legislative history of the Clayton Act suggests that Congress intended this Court to ignore injuries caused by such anticompetitive practices as predatory pricing.

## V

We hold that a plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury, and that a showing of loss or damage due merely to increased competition does not constitute such injury. The record below does not support a finding of antitrust injury, but only of threatened loss from increased competition. Because respondent has therefore failed to make the showing § 16 requires, we need not reach the question whether the proposed merger violates § 7. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

This case presents the question whether the antitrust laws provide a remedy for a private party that challenges a horizontal merger between two of its largest competitors. The issue may be approached along two fundamentally different paths. First, the Court might focus its attention entirely on the postmerger conduct of the merging firms and deny relief

---

U. Pa. L. Rev. 925, 939–940 (1979). As we stated in *Matsushita*, "predatory pricing schemes are rarely tried, and even more rarely successful." 475 U. S., at 589. Moreover, the mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because "cutting prices in order to increase business often is the very essence of competition . . . [;] mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.*, at 594.

unless the plaintiff can prove a violation of the Sherman Act. Second, the Court might concentrate on the merger itself and grant relief if there is a significant probability that the merger will adversely affect competition in the market in which the plaintiff must compete. Today the Court takes a step down the former path;[1] I believe that Congress has directed us to follow the latter path.

In this case, one of the major firms in the beef-packing market has proved to the satisfaction of the District Court, 591 F. Supp. 683, 709–710 (Colo. 1983), and the Court of Appeals, 761 F. 2d 570, 578–582 (CA10 1985), that the merger between Excel and Spencer Beef is illegal. This Court holds, however, that the merger should not be set aside because the adverse impact of the merger on respondent's profit margins does not constitute the kind of "antitrust injury" that the Court described in *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477 (1977). As I shall demonstrate, *Brunswick* merely rejected a "novel damages theory," *id.*, at 490; the Court's implicit determination that *Brunswick* forecloses the appropriate line of inquiry in this quite different case is therefore misguided. In my view, a

---

[1] Whether or not it so intends, the Court in practical effect concludes that a private party may not obtain injunctive relief against a horizontal merger unless the actual or probable conduct of the merged firms would establish a violation of the Sherman Act. The Court suggests that, to support a claim of predatory pricing, a competitor must demonstrate that the merged entity is "able to absorb the market shares of its rivals once prices have been cut," either because it has a high market share or because it has "sufficient excess capacity to enable it rapidly to expand its output and absorb the market shares of its rivals." *Ante*, at 119–120, n. 15. The Court would also require a competitor to demonstrate that significant barriers to entry would exist after "the merged firm had eliminated some of its rivals . . . ." *Ante*, at 120, n. 15. Indeed, the Court expressly states that the antitrust laws "require the courts to protect small businesses . . . *only* against the loss of profits from *practices* forbidden by the antitrust laws." *Ante*, at 116 (emphasis added). By emphasizing postmerger conduct, the Court reduces to virtual irrelevance the related but distinct issue of the legality of the merger itself.

competitor in Monfort's position has standing to seek an injunction against the merger. Because Monfort must compete in the relevant market, proof establishing that the merger will have a sufficient probability of an adverse effect on competition to violate § 7 is also sufficient to authorize equitable relief.

I

Section 7 of the Clayton Act was enacted in 1914, 38 Stat. 731, and expanded in 1950, 64 Stat. 1125, because Congress concluded that the Sherman Act's prohibition against mergers was not adequate.[2] The Clayton Act, unlike the Sherman Act, proscribes certain combinations of competitors that do not produce any actual injury, either to competitors or to competition. An acquisition is prohibited by § 7 if "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U. S. C. § 18. The legislative history teaches us that this delphic language was designed "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." S. Rep. No. 1775, 81st Cong., 2d Sess., 4–5 (1950).[3] In *Brunswick*,

---

[2] "Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890 [the Sherman Act], or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation." S. Rep. No. 698, 63d Cong., 2d Sess. 1 (1914).

[3] This Court has described the legislative purpose of § 7 as follows:

"[I]t is apparent that a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. Congress saw the process of concentration in American business as a dynamic force; it sought to assure the Federal Trade Commission and the courts the power to brake this force at its outset and before it gathered momentum." *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 317–318 (1962) (footnote omitted).

.

*supra*, this Court recognized that § 7 is "a prophylactic measure, intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil . . . .'" 429 U. S., at 485 (quoting *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 597 (1957)).

The 1950 amendment to § 7 was particularly concerned with the problem created by a merger which, when viewed by itself, would appear completely harmless, but when considered in its historical setting might be dangerous to competition.  As Justice Stewart explained:

> "The principal danger against which the 1950 amendment was addressed was the erosion of competition through the cumulative centripetal effect of acquisitions by large corporations, none of which by itself might be sufficient to constitute a violation of the Sherman Act. Congress' immediate fear was that of large corporations buying out small companies.  A major aspect of that fear was the perceived trend toward absentee ownership of local business.  Another, more generalized, congressional purpose revealed by the legislative history was to protect small businessmen and to stem the rising tide of concentration in the economy.  These goals, Congress thought, could be achieved by 'arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency.' *Brown Shoe Co.* v. *United States*, [370 U. S.,] at 317." *United States* v. *Von's Grocery Co.*, 384 U. S. 270, 283–284 (1966) (dissenting).

Thus, a merger may violate § 7 of the Clayton Act merely because it poses a serious threat to competition and even though the evidence falls short of proving the kind of actual restraint that violates the Sherman Act, 15 U. S. C. § 1. The language of § 16 of the Clayton Act also reflects Congress' emphasis on probable harm rather than actual harm. Section 16 authorizes private parties to obtain injunctive re-

lief "against threatened loss or damage" by a violation of § 7.[4] The broad scope of the language in both § 7 and § 16 identifies the appropriate standing requirements for injunctive relief. As the Court has squarely held, it is the threat of harm, not actual injury, that justifies equitable relief:

> "The evident premise for striking [the injunction at issue] was that Zenith's failure to prove the fact of injury barred injunctive relief as well as treble damages. This was unsound, for § 16 of the Clayton Act, 15 U. S. C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury; . . . he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 130 (1969) (citations omitted).

Judged by these standards, respondent's showing that it faced the threat of loss from an impending antitrust violation clearly conferred standing to obtain injunctive relief. Re-

---

[4] Section § 16 states, in relevant part:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . ." 15 U. S. C. § 26.

spondent alleged, and in the opinion of the courts below proved, the injuries it would suffer from a violation of § 7:

"Competition in the markets for the procurement of fed cattle and the sale of boxed beef will be substantially lessened and a monopoly may tend to be created in violation of Section 7 of the Clayton Act;

"Concentration in those lines of commerce will be increased and the tendency towards concentration will be accelerated." 1 App. 21.

More generally, given the statutory purposes to protect small businesses and to stem the rising tide of concentration in particular markets, a competitor trying to stay in business in a changing market must have standing to ask a court to set aside a merger that has changed the character of the market in an illegal way. Certainly the businesses — small or large — that must face competition in a market altered by an illegal merger are directly affected by that transaction. Their inability to prove exactly how or why they may be harmed does not place them outside the circle of interested parties whom the statute was enacted to protect.

## II

Virtually ignoring the language and history of § 7 of the Clayton Act and the broad scope of the Act's provision for injunctive relief, the Court bases its decision entirely on a case construing the "private damages action provisions" of the Act. *Brunswick*, 429 U. S., at 478. In *Brunswick*, we began our analysis by acknowledging the difficulty of meshing § 7, "a statutory prohibition against acts that have a potential to cause certain harms," with § 4, a "damages action intended to remedy those harms." *Id.*, at 486. We concluded that a plaintiff must prove more than a violation of § 7 to recover damages, "since such proof establishes only that injury may result." *Ibid.* Beyond the special nature of an action for treble damages, § 16 differs from § 4 because by its terms it requires only that the antitrust violation threaten

the plaintiff with loss or damage, not that the violation cause the plaintiff actual "injur[y] in his business or property." 15 U. S. C. § 15.

In the *Brunswick* case, the Court set aside a damages award that was based on the estimated additional profits that the plaintiff would have earned if competing bowling alleys had gone out of business instead of being acquired by the defendant. We concluded "that the loss of windfall profits that would have accrued had the acquired centers failed" was not the kind of actual injury for which damages could be recovered under § 4. 429 U. S., at 488. That injury "did not occur 'by reason of' that which made the acquisitions unlawful." *Ibid.*

In contrast, in this case it is the threatened harm—to both competition and to the competitors in the relevant market— that makes the acquisition unlawful under § 7. The Court's construction of the language of § 4 in *Brunswick* is plainly not controlling in this case.[5] The concept of "antitrust injury," which is at the heart of the treble-damages action, is simply not an element of a cause of action for injunctive relief that depends on finding a reasonable threat that an incipient disease will poison an entire market.

A competitor plaintiff who has proved a violation of § 7, as the *Brunswick* Court recognized, has established that injury may result. This showing satisfies the language of § 16 provided that the plaintiff can show that injury may result to him. When the proof discloses a reasonable probability that competition will be harmed as a result of a merger, I would also conclude that there is a reasonable probability that

---

[5] In *Brunswick*, we reserved this question, stating: "The issue for decision is a narrow one. . . . Petitioner questions only whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares." 429 U. S., at 484 (footnote omitted). Nor did we reach the issue of a competitor's standing to seek relief from a merger under § 16 in *Associated General Contractors of California, Inc.* v. *Carpenters*, 459 U. S. 519 (1983). *Id.*, at 524, n. 5.

a competitor of the merging firms will suffer some corresponding harm in due course. In my opinion, that reasonable probability gives the competitor an interest in the proceeding adequate to confer standing to challenge the merger. To hold otherwise is to frustrate § 7 and to read § 16 far too restrictively.

It would be a strange antitrust statute indeed which defined a violation enforceable by no private party. Effective enforcement of the antitrust laws has always depended largely on the work of private attorney generals, for whom Congress made special provision in the Clayton Act itself.[6] As recently as 1976, Congress specifically indicated its intent to encourage private enforcement of § 16 by authorizing recovery of a reasonable attorney's fee by a plaintiff in an action for injunctive relief. The Hart-Scott-Rodino Antitrust Improvements Act of 1976, 90 Stat. 1396 (amending 15 U. S. C. § 26).

The Court misunderstands the message that Congress conveyed in 1914 and emphasized in 1950. If, as the District Court and the Court of Appeals held, the merger is illegal, it should be set aside. I respectfully dissent.

---

[6] 15 U. S. C. § 15. This Court has emphasized the importance of the statutory award of fees to private antitrust plaintiffs as part of the effective enforcement of the antitrust laws. In *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 130–131 (1969), the Court observed:

"[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws."

See also *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 139 (1968); *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 502 (1969); *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 262 (1972).