CONSOLIDATED GOLD FIELDS, PLC, Newmont Mining Corporation, Newmont Gold Company, and Gold Fields Mining Corporation, Plaintiffs,

v.

ANGLO AMERICAN CORPORATION OF SOUTH AFRICA LIMITED, De Beers Consolidated Mines Limited, and Minorco, S.A., Defendants.

No. 88 Civ. 7191 (MBM).

United States District Court, S.D. New York.

May 16, 1989.

Richard J. Holwell, White & Case, New York City, for plaintiffs Newmont Mining Corp. and Newmont Gold Co.

Jeremy G. Epstein, Shearman & Sterling, New York City, for defendant Minorco, S.A.

OPINION AND ORDER

MUKASEY, District Judge.

Defendant Minorco, S.A. ("Minorco") moves pursuant to Fed.R.Civ.P. 65 to dissolve the preliminary injunction issued against its proposed takeover of Consolidated Gold Fields PLC ("Gold Fields"). The background and course of this contested takeover are detailed in this court's initial decision enjoining the takeover because the resulting combination would control 32.3% of the non-communist world gold market, 698 F.Supp. 487, the Second Circuit's decision affirming the injunction, 871 F.2d 252 (2d Cir. March 22, 1989), and this court's April 17 and April 24 opinions rejecting Minorco's proposal to hold separate Gold Fields' minority interest in three gold-producing companies, including plaintiffs Newmont Mining Corp. and Newmont Gold Corp. (collectively "Newmont"), pending di-

vestiture. Familiarity with that history is assumed, and it will not be recounted here.

After this court's last decision, the Panel on Takeovers and Mergers of the City of London (the "Panel") directed Gold Fields, a British corporation, and its wholly-owned subsidiary Gold Fields Mining Corp. ("GFMC"), to discontinue this lawsuit unless they obtained shareholder approval. On May 9, 1989, Gold Fields and GFMC voluntarily dismissed this action, leaving the Newmont companies as the only plaintiffs. Although the Panel considered whether to forbid Newmont as well from pursuing this litigation, it found that Gold Fields "does not in a legal sense control Newmont" and, thus, that the Panel could not stop Newmont—a United States company not subject to British regulations—from pursuing this litigation. (Epstein Aff., Exh. E at 20) On May 10, 1989, Newmont moved to hold Minorco in contempt, contending that Minorco was seeking to find a buyer for Newmont who would coerce Newmont into dropping this lawsuit. That application was denied as premature, based in part on Minorco counsel's representations that no such evasions were being considered.

Minorco now moves to dissolve the preliminary injunction, claiming that because Newmont told the Panel it was not controlled by Gold Fields, Newmont can no longer allege antitrust injury, and thus has no standing to continue this litigation. Specifically, Minorco claims that Newmont's assertion to the Panel that it is independent of Gold Fields directly contradicts its assertion here that, if Minorco takes over Gold Fields and holds 49.3% of Newmont's shares, Minorco could successfully limit production in Newmont's more efficient mines, and maximize profits by concentrating in the short run on less efficient South African gold production. Minorco claims that Newmont's representations to the Panel, made within the last two weeks, are changed conditions which warrant modification or dissolution of the preliminary injunction. *Ass'n Against Discrimination in Employment v. City of Bridgeport,* 710 F.2d 69, 74 (2d Cir.1983);

*King–Seeley Thermos Co. v. Aladdin Ind., Inc.,* 418 F.2d 31, 35 (2d Cir.1969).

The issue before the Panel was whether Gold Fields, a British corporation, exercised control over Newmont, a United States corporation, to such a degree that Newmont was essentially an alter ego of Gold Fields and therefore was subject to direction by the Panel. If Newmont were Gold Fields' alter ego, the Panel could apply British regulations to Newmont and require Newmont to withdraw from this litigation. That issue is distinctly different from the issue here: namely, whether Gold Fields has considerable influence over Newmont such that, if the takeover were completed and Minorco acquired Gold Fields' 49.3% ownership of Newmont, Minorco would be able to exert control over Newmont to suppress competition. The Panel's decision makes this distinction clear:

> We accept that, in view of its shareholding, Consgold may have considerable influence in regard to the general direction of the affairs of Newmont particularly in so far as its corporate plans might require the raising of new capital. We do not, however, consider that Consgold has controlled, procured or been a dominant influence in the commencement of continuance of the legal proceedings by Newmont.

(Epstein Aff., Exh. E at 20) Therefore, Newmont's representations to the Panel that it was not legally controlled by Gold Fields do not undercut its earlier position taken here that Gold Fields or an entity controlling Gold Fields' shares could inflict significant antitrust injury on Newmont's operations such that Newmont has antitrust standing.

Minorco claims also that both this court and the Court of Appeals misread the standstill agreement between Gold Fields and Newmont. It claims that the standstill agreement would operate even if Gold Fields' shares passed into Minorco's hands and, thus, that the agreement would prevent Minorco from exercising any control over Newmont's future. Minorco's claim that the standstill agreement would bind it because the agreement follows the shares

seems far-fetched. But even conceding that the standstill agreement would remain in force, Minorco, if the takeover is consummated, would still have considerable influence over Newmont such that Newmont would incur antitrust injury. Although Gold Fields has 49.3% of Newmont's shares which Minorco would acquire, it is allotted only 40% of the voting directors on the board. Twenty percent of the Board is made up of Newmont's management. The rest of the Board—40%—must be independent of Gold Fields or its successor Minorco. Thus, a purchase of 1% or 10% will not give Gold Fields, or Minorco, absolute control—or, as the Panel put it, control "in a legal sense" —over Newmont. Again, however, Minorco confuses absolute control with substantial influence. Even assuming that Minorco could not exercise absolute control over Newmont, it would have great influence over Newmont's future. Voting alliances with as few as one or two other directors would allow it to effect major changes in Newmont's operations. But even if Minorco is unable to make such alliances, Minorco would still have substantial influence by its sheer status as Newmont's largest shareholder. Indeed, the standstill agreement limits the number of additional shares that Newmont may issue and thus restricts its ability to raise capital. If Newmont exceeds those limits, Gold Fields—or its successor Minorco—could terminate the agreement and increase the 49.3% to an actual majority. Therefore, the mere current existence of the standstill agreement would not prevent Minorco from causing Newmont antitrust injury.

Minorco argues also that Newmont has made inconsistent statements about the propriety of positing a world non-communist gold market excluding scrap, investor and government sources. In testimony to Congress in October 1987, Richard B. Leather, Newmont's Executive Vice President, argued that a world gold market including scrap and official government sources was more appropriate in determining whether monopolization was a possibility. In this court, however, Newmont has maintained that the proper definition of the market should exclude those sources. Mi-

norco has argued this inconsistency before, both here and in the Court of Appeals, so it is clear that this material is not new such that it should be considered at this time. This inconsistency gains no probative force from its having been repeated in Newmont's annual report on Form 10K, filed March 29, 1989 with the Securities and Exchange Commission, which in any event is carefully hedged: *"[N]ormal* variations in current production do not have a *significant* impact ... on [gold's] price."* (Epstein Reply Aff., Exh. D at 1) (emphasis added) Furthermore, that Newmont has taken inconsistent positions on the question of relevant market definition has no impact on this court's October findings, made after full consideration of all these facts and arguments and fully explained at the time, that the best market definition was one excluding scrap and official government sources. That market definition was accepted by the Court of Appeals. Reconsideration of that issue is proper only at trial.

Finally, Minorco argues that a hold separate order and divestiture is more appropriate now that Gold Fields has left this litigation because, Minorco claims, Newmont cannot now allege antitrust injury from the takeover itself based on Gold Fields' interests in GFSA and Renison. According to Minorco, the only antitrust injury Newmont can now allege—Minorco's control of 49.3% of its shares threatening to disrupt Newmont's more efficient production— could be prevented by a hold separate order barring Minorco from exercising any control over Newmont's operations or decision-making. Because Newmont is a United States corporation, Minorco's argument continues, the enforcement and detection problems inherent in a hold separate order, as detailed in this court's April 17 and April 24 opinions, would no longer exist.

The major premise of Minorco's argument is incorrect. Newmont can allege antitrust injury from the takeover of Gold Fields, and Gold Fields' interests in GFSA and Renison must be considered in fashioning relief. This court found that Newmont, wholly apart from any direct effect on it arising from Minorco's ownership of 49.3% of Newmont's shares, could suffer antitrust injury in the form of reduced control

over pricing and output as an independent competitor if the takeover succeeded and Minorco controlled a greater share of the world non-communist gold market. 698 F.Supp. at 499–500. This complaint of *lessened* competition is vastly different from the complaint of *greater* competition rejected in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 114, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986), a case relied on by Minorco. Indeed, the Second Circuit has recently reaffirmed that, despite *Cargill*, competitors have antitrust standing to enjoin a merger of two competitors where the effect would be to increase substantially concentration in the market and thus to decrease competition. *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 108–110 (2d Cir.1989). Even taking Newmont's market share—approximately 2%—out of the resulting market share of a combined Gold Fields and Minorco, the resulting combination would command nearly 30.2% of the market. That percentage still exceeds the 30% held by the Supreme Court in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), to trigger a presumption of illegality. Thus, Newmont has standing as an independent competitor to allege that the resulting combination of Gold Fields and Minorco would substantially lessen competition and injure it. It follows, then, that Newmont is entitled to injunctive relief against all the antitrust ramifications of the takeover, not just control of Gold Fields' shares in Newmont. Accordingly, a hold separate order limited to Gold Fields' interest in Newmont would not satisfy the antitrust concerns here. Rather, all three companies—Renison, GFSA, and Newmont—would have to be held separate in order to solve the antitrust problems here.

But even if somehow a hold separate order against Newmont were sufficient, Minorco's proposal would still fail to meet the test for such an order described in this court's April 17 and April 24 opinions. Problems of enforcement and detection would remain. Unidentified members of the Anglo group remain free to acquire shares. The reporting requirements of the Williams Act and the Hart–Scott–Rodino Act are not sufficient protection against a secret accumulation of shares because many foreign countries, including South Africa, shield the ownership of companies from public scrutiny. Minorco seems to be arguing that the fact that the other two gold-producing companies owned by Gold Fields—GFSA and Renison—were foreign was a deciding factor in this court's decision that a hold separate order was not effective at that time. Because Newmont is a United States corporation, Minorco claims, problems of detection and enforcement will vanish. Contrary to Minorco's view, it was not the foreign character of the corporations to be held separate that posed problems, but, rather, that many of the Anglo group members are not subject to this court's jurisdiction and thus could easily evade this court's or a special master's detection. I have detailed these enforcement and detection problems in my April 17 and April 24 opinions; there is no reason to explore that well-trod ground again. Suffice it to say that, even if a hold separate order were necessary only for Newmont, it would still not be as effective as a full stop preliminary injunction.

Accordingly, Minorco's motion to dissolve the preliminary injunction is once again denied. Because the tender offer will expire tomorrow, I deem that Minorco has requested a stay of this order pending appeal, and that stay is denied. A stay of a refusal to dissolve an injunction in favor of a hold separate order is, in an event, an elusive concept to say the least. That Minorco has only until tomorrow to appeal this decision is regrettable. Minorco, however, had ample time to appeal this court's April 17 and April 24 decisions. Indeed, this court decided those motions on an expedited basis precisely to afford the parties time to appeal. For its own reasons and aware of the onrushing deadline, Minorco chose not to do so. It should not now complain of unfair prejudice because it chose voluntarily a strategy which now leaves little time to appeal.

SO ORDERED.