**PHOTOTRON CORPORATION,**

v.

**EASTMAN KODAK COMPANY, et al.**

Civ. A. No. CA4–87–910–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 22, 1988.

Richard Lee Brown, S. Gary Werley, Bishop, Payne, Lamsens & Brown, Fort Worth, Tex., Joseph L. Alioto, Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for plaintiffs.

Marvin S. Sloman, Fletcher L. Yarbrough, Tyler A. Baker, Vikram Chandhok, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Eastman Kodak Co.

E. Glen Johnson, Kelly, Appelman, Hart & Hallman, Fort Worth, Tex., Charles E. Koob, Joseph F. Tringali, Kathryn A. Clokey, Simpson Thacher & Bartlett, New York City, for Fuqua Industries and Colorcraft Corp.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Phototron seeks a preliminary injunction to enjoin Kodak and Colorcraft from combining their United States photo finishing operations. The requirement that the judiciary be candid is perhaps absolute:[1] the Court admits that the question presented here is close. But for the reasons stated below, the Court finds that the proposed combination must be preliminarily enjoined[2] until the merits of this action can be reached, as the Defendants' consolidated operations may tend to harm competition in violation of Section 7 of the Clayton Act.[3]

In sum, the Court concludes the following *solely* for the purpose of determining whether a preliminary injunction should issue:

1. Phototron has standing to challenge the proposed combination;

2. For the purposes of analyzing the proposed combination under Section 7 of the Clayton Act, wholesale photo finishing is the relevant product market;

3. In light of alleged predatory pricing activities and preferential pricing practices, the proposed combination may substantially lessen competition in the national market for the procurement of wholesale photo finishing services in violation Section 7 of the Clayton Act; and,

4. Phototron is threatened with significant loss or damage within the meaning of Section 16 of the Clayton Act as a result of the proposed combination, and preliminary injunctive relief should enter to prevent threatened violations of the Act.

## I. FACTS AND PROCEEDINGS

The parties mutually agreed that Phototron's Application for Preliminary Injunction would be decided upon affidavits and memoranda of law without an evidentiary hearing. On February 5, 1988, oral argument was heard; counsel for both sides presented fine and thoroughly-prepared arguments. The Court emphasizes that this issue is being decided based upon *limited* documentary evidence; this limitation results solely from the parties' agreement. There has been no discovery. While the evidence submitted in support of and in opposition to the preliminary injunction "need not be repeated" at trial,[4] it should be understood that any fact finding made here is not irrevocably set in stone. Since the scope and weight of the evidence may change as the action proceeds, so may these fact findings. With that admonition in mind, the Court submits the following.[5]

---

1. Shapiro, *In Defense of Judicial Candor*, 100 Harv.L.Rev. 731, 750 (1987).

   With characteristic honesty and eloquence, Learned Hand recognized this fundamental tension, perhaps paradox, reposed in the antitrust laws. Having concluded that Congress "did not condone good trusts and condemn bad ones; it forbad all," he announced with equal fervor, "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir.1945).

2. Section 16 of the Clayton Act provides in pertinent part:

   Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ..., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...., a preliminary injunction may issue.

15 U.S.C.A. § 26 (West Supp.1987).

3. Section 7 of the Clayton Act prohibits mergers when the "effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly...." 15 U.S.C.A. § 18 (West Supp.1987).

4. Fed.R.Civ.P. 65(a).

5. Rule 52(a) of the Federal Rules of Civil Procedure provides in pertinent part: "[I]n granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review."

   Rule 65(a) recognizes this fact-finding requirement. It states that even when the hearing on the application for a preliminary injunction is not consolidated with a trial on the merits, "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial."

These findings of fact and conclusions of law are based solely upon the affidavits, exhibits, briefs, arguments, and file developed thus far in this cause.

The Plaintiff Phototron Corporation ("Phototron") has brought an action against Defendants Eastman Kodak Company ("Kodak"), Fuqua Industries, Inc. ("Fuqua"), and Colorcraft Corporation ("Colorcraft"). In addition to its causes of action under Texas common law, Phototron has asserted that the Defendants have violated Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act.

The Defendants Kodak, Fuqua, and Colorcraft have entered into an agreement to combine the photo finishing operations of Kodak and Colorcraft. Kodak and Colorcraft have agreed to postpone the consummation of this transaction until February 22, 1988. The Court agreed to issue a ruling on Phototron's Motion for Preliminary Injunction at that time.

Colorcraft is a wholly-owned subsidiary of Fuqua Industries. Fuqua conducts its photo finishing operations through Colorcraft. Phototron, Kodak, and Colorcraft all provide wholesale photo finishing services. The photo finishing industry is composed of amateur and professional laboratories. There is no dispute that, for purposes of market determination, professional and amateur labs are essentially noncompeting and that only the labs developing the photographs of amateurs must be considered here.

Nor is there any serious dispute between the parties that the amateur photo finishing industry is divided, basically, into four segments or "product markets":[6] (1) "instant" photo finishing services where photo finishing is accomplished on-site at "minilabs"; (2) large integrated processing labs ("captive photofinishing labs") tied to major retail establishments, who process photographs in their own facilities;[7] (3) retail "mail-order" operations where photographs are sent to large-scale photo finishing laboratories for processing; and, (4) wholesale processing labs that market photo finishing to retailers on a competitive basis.

The parties also agree, or at least for the purposes of argument assume, that the relevant geographic market is the national market. Based upon the record, the Court also agrees that the national market is the applicable one. It is at this point—the point of determining the relevant product market—that the parties and the experts part company.

The Plaintiff's expert contends that *wholesale* photo finishing is the relevant economic market for antitrust analysis. Kodak and Colorcraft each have engaged an expert. Their experts contend that *all sources* of photo finishing services that are available to amateurs—in addition to the wholesale photo finishing market—should be included in the relevant market. All three experts are knowledgeable, well-qualified, and respected economists.

For the limited purpose of determining whether a preliminary injunction should issue, the Court finds that Phototron's expert is the most persuasive since he emphasizes the actual conditions in the photo finishing marketplace[8] and the theoretical

---

6. The "relevant market" concept entails two separate considerations: (1) the product market or "line of commerce"; and (2) the geographic market or "section of the country." *See, e.g., Indiana Farmer's Guide Publishing Co. v. Prairie Framer Publishing Co.,* 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356 (1934).

The outer boundaries of a product market are determined by reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.

*Brown Shoe Company v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962).

7. Wal–Mart and Eckerd Drugs would be stores with their own "minilab" for film processing.

8. In his Affidavit Professor Saving writes:

The "quick" finishing market is separate and distinct from the wholesale photofinishing market in that it represents those consumers who place a high value on time. The *Photofinishing Industry Report* indicates that in 1986 minilab processing had an average cost of $8.23. Film processed in large labs ranged in cost from $5.36 retailed at Department

implications of the proposed combination.[9] Hence, for the consideration of the issue at hand, the relevant product market will be that segment of the amateur photo finishing market defined above as "wholesale photofinishing labs that market photofinishing to retailers on a competitive basis."

In 1954, Kodak had a near absolute monopoly in the color photo finishing market.[10] During that same year, Kodak entered into a consent decree with the Justice Department which dramatically changed the structure of this market. "Kodak was forbidden to link photofinishing to film sales, and it agreed to make its processing technology, chemicals and paper available to rivals at reasonable rates."[11] As a result of the consent decree, Kodak reduced its overall market share in photo finishing from 96% in 1954 to 10% in 1976. However, since 1976, Kodak appears to have embarked upon a series of acquisitions to increase its share of the wholesale photo finishing market.

In 1985, Kodak owned 10 photo finishing laboratories. In December of 1986, Kodak purchased Fox Photo ("Fox") which itself had previously acquired a number of photo finishing plants. At the time of its acquisition, Fox owned 20 such laboratories. In October of 1987, Kodak acquired American Photo Group Corporation, gaining 20 more wholesale photo finishing plants with this acquisition, Qualis Photofinishing Company, and CX Corporation.

Stores, $5.34 retailed at Drug Stores, $4.71 retailed at Discount Stores, $4.23 retailed at Supermarkets, and $3.85 retailed through mail order. The weighted average retail cost of photofinishing in large labs was $4.57. Thus, minilab film processing was 80 percent more costly than large lab processing. This large price differential is suggestive of significant market segmentation.

. . . .

Important for the issue at hand is the fact the "captive" labs do not represent a source of processing for retail outlets that are not part of the integrated system. Thus, even though the "captive" photofinishing labs are part of the overall supply of photofinishing services, they may not exert significant competitive pressure on the price and terms upon which the independent wholesale photofinishing lab services are available.

Fuqua has also demonstrated a proclivity for acquiring its competitors. In 1985, Fuqua purchased Berkey Photo, Inc. In 1987, Colorcraft, a wholly-owned subsidiary of Fuqua, bought Magnicolor Photo labs, which had six wholesale photo finishing plants. If the Kodak-Colorcraft combination takes place, there will be a dramatic concentration of the wholesale photo finishing industry compared to the industry that existed just three years ago.[12]

In 1986, the amateur photo finishing market had a 4.169 billion-dollar value. Wholesale photo finishers account for approximately 17 to 22 percent of the amateur photo finishing market by value. According to Phototron's expert, this 17 to 22 percent market share translates into a dollar volume for wholesale finishers of between $704 and $911 million. Kodak is estimated by industry sources to have sales of wholesale photo finishing of $300 million. Using the conservative figure of $911 million, Kodak now has approximately a 33 percent share of the wholesale photo finishing market.

The proposed merger with Colorcraft would increase this market share. Colorcraft owns 41 photo finishing labs. It had wholesale photo finishing sales of almost $300 million in 1986.[13] The Kodak-Colorcraft transaction would result in a firm with 94 large wholesale photo finishing laboratories and projected sales of $600 million in sales. Since the entire wholesale photo finishing market is $911 million, the

Affidavit of Thomas R. Saving at pp. 5–6.

9. *See infra* pp. 1064–1065.

10. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 270 (2d Cir.1979).

11. *Berkey,* 603 F.2d at 271.

12. After the proposed combination, there will be only four or five separate entities with more than local scope in the wholesale photofinishing market. They are: the Plaintiff Phototron, Fotomat, and Guardian Photo (a member of the Kodak "Colorwatch" program). None of the remaining competitors operating a national scale will have one-fifth of the combined size of the defendants.

13. Colorcraft had $265 million and Magnicolor, a newly acquired subsidiary, had $35 million.

combination of Kodak and Colorcraft will have a market share of 66 percent. The market share of the proposed Kodak-Colorcraft firm measured in terms of sheer numbers of large photo finishing labs is also in line with the dollar-value percentage.[14] The Kodak-Colorcraft combination will produce a combined market share between these two entities of somewhere between 66 to 85 percent in wholesale photo finishing.

This increased market share is particularly relevant since Kodak maintains a dominant position in both producing and supplying raw materials that are used in photo finishing. The materials market consists of photochemicals and paper. Of the firms that supply these materials, Kodak possesses almost 80 percent of the materials market. Kodak occupies a similar position in regard to color and black and white film used by amateur photographers. Phototron's expert states that the "amateur photographer, the largest customer of photographic products and services, purchases more than 80 percent of his film from Kodak."[15] Based upon the record as presented, Kodak will have achieved, after the proposed combination, extensive vertical integration in all three related markets: (1) wholesale photo finishing, (2) photo finishing materials, and (3) color film.

This vertical integration is particularly enhanced by Kodak's "Colorwatch" program. "Colorwatch" is an advertising program which requires retail outlets to limit their selection of wholesale photo finishing firms to those who exclusively utilize Kodak photo finishing materials. Phototron's expert describes the program as follows:

> Kodak requires that wholesale processing labs that process film for Colorwatch customers use only Kodak chemicals and paper for all their photofinishing independent of whether or not that photofinishing is for a Colorwatch customer. Ko-

dak's unique advantage over its competitors stem from the fact that Kodak can advertise its name, thereby enhancing sales of both film, photofinishing materials, and photofinishing services. Because Kodak, owns only a small market share of retail outlets, it cannot directly control the retailers' selection of a wholesale photofinishing firm. However, if through advertising of the Colorwatch seal, Kodak can gain customer preference for retail outlets displaying the colorwatch seal, then Kodak can expand its sales of photofinishing materials.[16]

The Kodak's expansion into the wholesale photo finishing labs through the proposed combination gives Kodak the ability to limit entry into the wholesale photo finishing market. This is especially onerous where Phototron and its Affiant, Joseph T. Borkowski, have alleged predatory pricing activities on the part of the Defendants. It is alleged, both in Phototron's verified Complaint and in President's Affidavit, that Kodak and Colorcraft have quoted prices to retailers which demonstrate their subsidiary wholesale photo finishers are either "operating at a loss, or are receiving discounts from Kodak on color print paper and chemicals."[17] Although the record before the Court is limited, it will support a finding that the proposed Kodak–Colorcraft combination will enable the combined entity to effectuate the below-cost pricing activity Phototron alleges it has already engaged in.

In light of the alleged predatory pricing activities, the dominant position that the proposed Kodak–Colorcraft entity would occupy in the wholesale photo finishing market—considered jointly with the leverage Kodak maintains through its vertical integration in related markets of photo finishing materials and color film—severely threatens Phototron's ability to compete

---

14. The Kodak–Colorcraft combination would represent more than 55 percent of all wholesale photofinishing labs, or 94 out 170 large non-captive wholesale photofinishing labs in the United States. Affidavit of Thomas R. Saving at p. 8.

15. Affidavit of Thomas R. Saving at p. 9; Affidavit of Joseph T. Borkowski at p. 4.

16. Affidavit of Thomas R. Saving at p. 10. The Colorwatch program is also fully explained in paragraph 15 of the Plaintiff's Complaint.

17. Affidavit of Joseph T. Borkowski at p. 5.

for business from retail outlets. After the proposed combination, Kodak and Colorcraft will have significantly increased power to purchase paper and chemicals at reduced prices, while forcing Phototron to purchase the same items at a higher price.

Thus, considered as a whole, the limited record before the Court supports two findings of the utmost importance: (1) that the alleged below-cost pricing activities and preferential pricing practices of Kodak and Colorcraft will "lessen competition" and "tend to create a monopoly;" [18] and (2) that these predatory practices will create a substantial likelihood of significantly impairing, perhaps even destroying, Phototron's business. The loss of Phototron as an independent competitor in the wholesale photo finishing marketplace would further reduce competition and increase the combined entity's alleged monopoly power.

## II. LEGAL DISCUSSION AND CONCLUSIONS OF LAW

### A. Standing to Enjoin

■ Phototron's standing to enjoin the proposed Kodak-Colorcraft combination is heavily disputed. In this regard, the applicability of only one case is in issue: *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). The Defendants insist that this recent Supreme Court case prevents the Court from reaching the substance of Phototron's antitrust claims. When viewed in the aftermath of *Cargill*, the Defendants argue, the Plaintiff lacks standing to challenge this joint venture. The Court disagrees. Phototron has standing to enjoin the proposed combination.

In *Cargill*, the Excel Corporation,[19] the second-largest entity in both the cattle slaughtering and boxed beef production

markets, sought to merge with the third largest competitor in those markets, Spencer Foods.[20] IBP, Inc., not a party to the *Cargill* action, was the largest beef packer in the United States. After the proposed combination, the relative market shares in the beef industry would have appeared as follows:

| Cattle Slaughtering Market | | Box Beef Production Market | |
|---|---|---|---|
| IBP, Inc. | 24.4% | IBP, Inc. | 27.3% |
| Defendants | 20.4% | Defendants | 20.4% |
| Plaintiff | 5.5% | Plaintiffs | 5.7% |

It is important to note that even after the Excel-Spencer merger, their combined market share would still not have exceeded that of the largest market participant, IBP. The Plaintiff, Monfort, the nation's fifth largest beef packer, brought an action under section 16 of the Clayton Act seeking to enjoin the prospective merger.[21]

The parties in *Cargill* agreed to consolidate, under Rule 65(a), the motion for preliminary injunction with a full trial on the merits. Plaintiff Monfort never alleged or proved a scheme of predatory pricing on the part of the Defendants. The District Court in its Memorandum Opinion twice made note of this omission.[22] Yet, the District Court found "that the effect of the proposed acquisition may be substantially to lessen competition or tend to create a monopoly...." [23] The District Court, pursuant to section 16 of the Clayton Act, permanently enjoined the merger. The Tenth Circuit Court of Appeals affirmed the District Court's ruling but was reversed on appeal to the Supreme Court.

The Supreme Court defined predatory pricing as "pricing *below* an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." [24]

---

**18.** 15 U.S.C.A. § 18 (West Supp.1987).

**19.** Excel was a wholly-owned subsidiary of Cargill.

**20.** *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 487, 93 L.Ed.2d 427 (1986).

**21.** *Cargill*, 107 S.Ct. at 487–88.

**22.** *Cargill*, 107 S.Ct. at 494.

**23.** *Monfort of Colorado, Inc. v. Cargill*, 591 F.Supp. 683, 710 (D.Colorado 1983).

**24.** *Cargill*, 107 S.Ct. at 493. The caselaw of the Fifth Circuit is in accord with the requirement that pricing to be predatory must be "below cost." In *Adjusters Replace–A–Car v. Agency*

The Court found that Monfort's allegations and proof did not support a finding of this essential form of antitrust injury. The Supreme Court found that Monfort's injury resulted only from increased competition, not anticompetitive tactics on the part of the Defendants. Since price competition was not a predatory activity and no allegation had been made that Excel would act with predatory intent after the merger, the Court concluded that "Monfort neither raised nor proved any claim of predatory pricing before the District Court."[25] The linchpin of the *Cargill* decision is the requirement that a plaintiff seeking to *permanently* enjoin an allegedly unlawful business combination must allege and prove an actionable antitrust injury which results from the proscribed combination.[26]

In this cause, the Defendants' insistence that Phototron lacks standing to attack the Kodak-Colorcraft joint venture stems from their overly broad interpretation of *Cargill.* The case at hand is distinguishable on three grounds.

First, in *Cargill*, the Supreme Court reached its conclusion after there had been a complete trial on the merits. Hence, the requirement that a plaintiff seeking relief under section 16 of Clayton Act plead and *prove* a related antitrust injury. The parties in *Cargill* agreed to a consolidated trial on both the preliminary injunction and the merits of the case. Here, the parties reached no similar agreement. Only the issue of *preliminary* injunctive relief is before the Court. Thus the holding of *Cargill* applies to this case in a more limited sense. Phototron must allege an antitrust injury which flows from the proposed Kodak-Colorcraft combination and sustain only that burden of proof which would entitle it to *preliminary*, not permanent, injunctive relief.

Second, unlike the plaintiff in *Cargill*, Phototron has made the requisite allegations in its Complaint and, as will be seen in Part II(B) of this Opinion, made the applicable showing required for equitable injunctive relief.[27]

In paragraph 15(i) of its verified Complaint, Phototron alleges a predatory pricing scheme:

> [W]holesale photo finishing plants owned by defendant Kodak, defendant Colorcraft, and Guardian have charged prices for photo finishing services to actual and potential retail customers of plaintiff that are substantially below the prices plaintiff can charge and still operate profitably, and that reflect that defendant Kodak's wholly owned plants and plants owned by defendant Colorcraft, Guardian, and others are either paying substantially lower prices for Kodak photographic paper and chemicals than is plaintiff, receiving concession, inducements, and other considerations that are equivalent to lower prices for Kodak photographic paper and chemicals, *or operating unprofitably* or at substantially reduced profit margins for at least the

---

Rent-A-Car, Inc., 735 F.2d 884, 890–91 (5th Cir. 1984), the Court wrote:
> In sum, although we follow with interest the continuing debate over theories of predation, the law in this circuit is that where barriers to entry are not pronounced predatory pricing is not established unless the defendant has set his price below his average variable cost.

The Court pointed out in a footnote that "[w]hen a legitimate dispute arises as to the characterization of certain costs [fixed or variable], the question is one of fact to be resolved by the jury." *Adjusters*, 735 F.2d at 891.

**25.** *Cargill*, 107 S.Ct. at 494.

**26.** *Cargill*, 107 S.Ct. at 491 (citing *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). The Court wrote: "We conclude that in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Id.*

**27.** The movant bears the burden of proving the four elements necessary for the issuance of a preliminary injunction:
> (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest.

*Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707, 710 (5th Cir.1984).

short term, until plaintiff is forced to go out of business or sell to defendants or their surrogates.

Below-cost pricing is further alleged in the Affidavit of Joseph T. Borkowski, President of Phototron:

> Wholesale photo finishers controlled by Kodak and Colorcraft have approached major retail accounts of Phototron with photo finishing prices competitive with or below the photo finishing prices offered to these same customers by Phototron. The prices quoted by wholesale photo finishers controlled by Kodak and Colorcraft demonstrate either that *such wholesale photo finishers are operating at a loss,* or are receiving discounts from Kodak on color print paper and chemicals....[28]

Thus, Phototron has adequately alleged "threatened loss or damage of the type the antitrust laws were designed to prevent...."[29]

Third, the antitrust injury Phototron claims it has or will suffer is sufficiently related to the Defendants' proposed, and allegedly unlawful, combination.[30] This related antitrust injury is markedly different than the injury the plaintiff in *Cargill* alleged—an injury which resulted only from increased competition. Two striking differences between the case at hand and *Cargill* bear this out.

The first critical distinction arises in terms of market share. Even after the proposed merger in *Cargill,* the defendants would have had only 20.4% of the relevant market. The *Cargill* defendants would have occupied only a second-place position of dominance in the relevant market in vigorous competition with the dominant firm, IBP. But this is not the case before the Court. Here, the Defendants are the two largest competitors in the wholesale photo finishing market. They will double this market share through the proposed combination. This dominant market share is particularly important in light of Kodak's strong position in two related markets. Kodak is the dominant supplier to the photo finishing industry. It is also the dominant manufacturer of conventional color photographic film.[31] Kodak's dominance in these related markets leads the Court to the second distinguishing factor concerning relevant and related markets which arises in this case but was not present in *Cargill.*

Cleverly, the Defendants argue that Phototron's injury does result from the proposed Kodak-Colorcraft transaction. "Rather, the allegation complains of actions allegedly taken by Kodak in the implementation of the Colorwatch program."[32] This argument is not without merit. But based upon the record as presented and considered as a whole, the Court finds that the Colorwatch program is sufficiently related to the Kodak-Colorcraft transaction so that it could reasonably be said that the proposed combination will further expand and aggravate the antitrust injury which flows from the Defendant's alleged predatory pricing activity. The further facilitation of these alleged activities would constitute "threatened loss or damage by a violation of the antitrust laws" to Phototron's business.[33]

---

**28.** Affidavit of Joseph T. Borkowski at pp. 4–5. *See also* Plaintiff's Supplemental Memorandum of Law at p. 4 ("Kodak and Colorcraft photo finishers have been quoting prices to Phototron customers at levels that are either *below cost* or that reflect paper and chemicals pricing substantially below list.") (emphasis added).

**29.** *Cargill,* 107 S.Ct. at 491.

**30.** "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corporation v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

**31.** The record before the Court supports this finding. Mr. Borkowski states in his Affidavit:

> Kodak both sells the film that customers return to retailers for processing by wholesalers, and supplies the materials, i.e., color print paper and chemicals, that wholesale photo finishers primarily use to develop the film delivered to them by retail customers. In both markets, Kodak possesses a dominant share, at least 80%.

**32.** Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction at p. 8.

**33.** 15 U.S.C.A. § 26.

A review of the limited record before the Court uncovered no convincing evidence which would militate against such a finding. Rather, Kodak's dominance in related markets supports it. The *Cargill* case is particularly dissimilar in this regard. There, the proposed combination created no threat of dominance in either the relevant *or* related markets.[34]

For the reasons stated above, Phototron has standing to challenge the proposed combination.

## B. Standards Governing the Issuance of an Injunction

■ When seeking injunctive relief, the moving partying bears the burden of persuasion on each of the following elements: (1) substantial likelihood that it will prevail on the merits,; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to it outweighs the threatened harm the injunction may do to the defendant, and (4) that the granting the preliminary injunction will not disserve the public interest.[35] When the wholesale photo finishing is considered the relevant product market, Phototron has met its burden of persuasion on each of these elements.

### 1. Substantial Likelihood of Success on the Merits

Section 7 of the Clayton Act prohibits acquisitions or combinations the effect of which is substantially to lessen competition, or to tend to create a monopoly.[36] Based upon the limited record before the Court and its preliminary finding that wholesale photo finishing is the relevant product market, the combination in issue here is the type precluded by section 7.

The Kodak-Colorcraft combination will possess between 66 and 85 percent of the wholesale photo finishing market. Because of previous acquisitions,[37] the whole sale photo finishing market has diminished in size to only two major national entities (the Defendants). If this combination is not enjoined, at least until the structure of the wholesale photo finishing market can be thoroughly examined, a strong case can be made that there will be only one wholesale photo finishing entity operating on a national scale. The concentration threatened here is even more severe than that condemned in other Supreme Court cases.[38]

This proposed combination also has another menacing aspect: vertical integration. Kodak is not only a horizontal competitor of Colorcraft, but also a substantial, arguably predominant, supplier of raw materials to the wholesale photo finishing industry. This position of dominance and control, considered in conjunction with Kodak's influence over Colorcraft through the "Colorwatch" program, seriously threatens competition not only in the wholesale photo finishing services market but also in the color print paper and chemicals market. This form of vertical integration when analyzed in conjunction with the horizontal aspects of the proposed combination leads the Court to the conclusion that if combination is not enjoined, at least preliminarily, its effect will be to substantially less competition and tend to create a monopoly.[39] The need for immediate temporary relief is further support by Phototron's prima facie showing of predation at the photo finishing level.[40]

---

34. *Cargill,* 107 S.Ct. at 487. *See also* Plaintiff's Supplemental Memorandum of Law at p. 8 ("this case presents vertical aspects that render the injury to Phototron much different from that threatened in *Cargill*....").

35. *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974); *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 710 (5th Cir.1984).

36. 15 U.S.C.A. § 18 (West Supp.1987).

37. *See supra* note 12 and accompanying text.

38. *See, e.g., United States v. Pabst Brewing Co.,* 384 U.S. 546, 551, 86 S.Ct. 1665, 1668, 16 L.Ed. 2d 765 (1966); *United States v. Von's Grocery Co.,* 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555 (1966); *Brown Shoe Co. v. United States,* 370 U.S. 294, 300, 82 S.Ct. 1502, 1510, 8 L.Ed.2d 510 (1962).

39. 15 U.S.C.A. § 18 (1982)

40. *See supra* pp. 1067–1068.

Moreover, the Court cannot ignore Kodak's long history of anticompetitive behavior.[41] In *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed.2d 1260 (1948), the Supreme Court stated that "the fact that the power created by size was utilized in the past to crush or prevent competition is potent evidence that the prerequisite purpose or intent attends the presence of monopoly power."[42] The limited record currently developed in this cause—a record replete with conflicting expert and lay affidavits—requires the Court to cautiously heed the direction given by the Supreme Court, its master all judicial matters.

The Court's analysis has focused primarily on the Phototron's likelihood of success on its section 7 claim. Having found that Phototron has met its burden of persuasion in proving a likelihood of success on this claim, the Court mentions only in passing that Phototron bears a similar chance success on its claims arising under sections 1 and 2 of the Sherman Act. This likelihood of success on the Sherman Act claims rests on the Court's preliminary determination of the applicable product market. Based upon the limited record before the Court, it has found that the wholesale photo finishing market is the relevant one. The alleged 66 to 85 percent market share that the Kodak–Colorcraft combination would possess clearly evidences the type of combination, monopoly, or attempted monopolization that sections 1 and 2 of the Sherman Act prohibit.

For the reasons stated above, Phototron has sustained its burden of persuasion and shown that it has a substantial likelihood of success on the merits of its claim arising under section 7 of the Clayton Act.[43] Section 7 is designed to stop "mergers at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency."[44]

### 2. Substantial Threat of Irreparable Injury

This "lessening of competition" is precisely the type of harm that Phototron and other remaining competitors are threatened with in the wholesale photo finishing marketplace. "Antitrust laws ... were enacted for the protection of *competition*, not *competitors*."[45] This threat of harm is significantly acerbated by (1) the predominant share of the wholesale photo finishing market the Kodak–Colorcraft combination would possess,[46] (2) the horizontal and vertical leverage in both the relevant and related markets that the combined entity could exercise, and indeed in the past has exercised, and (3) the prima facie showing made by Phototron that Kodak has priced its wholesale photo finishing services and raw materials below cost.

From this predation and loss of competition flows antitrust injury. Activities which threaten this form of injury are may

---

**41.** *See Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (verdict upheld against Kodak for monopolizing photographic material and supply markets); *United States v. Eastman Kodak Co.,* No. 6450, 1954 Trade Cas. (CCH) ¶ 67,920 (W.D.N.Y. Dec. 21, 1954) (consent decree eliminating Kodak processing charge included in purchase of film); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 299–305 (2d Cir.1979) (upholding Kodak's violation of section 1 of the Sherman Act), *affirming in part,* 457 F.Supp. 404 (S.D.N.Y.1978).

**42.** 334 U.S. 131, 174, 68 S.Ct. 915, 937, 92 L.Ed. 1260 (1948).

**43.** *See, e.g., Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.,* 621 F.2d 683, 686 (5th Cir.1980) ("a showing of *some* likelihood of success on the merits will justify temporary injunctive relief") (emphasis original).

**44.** *Brown Shoe Co. v. United States,* 370 U.S. 294, 317–18, 82 S.Ct. 1502, 1519–20, 8 L.Ed.2d 510 (1962).

**45.** *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

**46.** The Court again emphasizes, in an overabundance of caution, that it refers only to the relevant product market as the Court has defined it for the limited purpose of determining whether preliminary injunctive relief should issue.

be enjoined under section 16 of the Clayton Act if under similar circumstances a court of equity would grant injunctive relief.[47] An entitlement to injunctive relief requires a showing that the purported injury cannot be undone through monetary remedies.[48] As the movant, Phototron bore the burden of proving that monetary damages would not be an adequate remedy for the alleged antitrust injury.

Phototron has met that burden. Based on the limited record before the Court, the present situation demonstrates the threat of irreparable injury and no adequate legal remedy. Phototron is threatened with the loss of its business. As its verified complaint states, Phototron has already lost several major accounts. If this pattern persists, Phototron could go out of business, further reducing competition in an arguably already monopolized wholesale photo finishing market.

Over the last two years, Phototron has sustained substantial losses; sales have fallen nearly 50 percent. This limited record supports a finding that these losses may be attributable to the predatory pricing practices of Kodak and Colorcraft.[49] This inference is further sustained by the fact finding that Kodak occupies a dominant position in the conventional photographic film and the color print paper and chemicals markets. Both are major competitors in the wholesale photo finishing markets; if combined, no comparable competitor will exist on a national scale.

Two other factors which require injunctive relief must also be considered here in addition to Phototron's irreparable harm. First, Courts continue to struggle with the question of divestiture as a private remedy.[50] Second, Phototron and other competitors may close. Indeed, as a result of the Kodak–Colorcraft combination, the Defendants will begin the "rationalization of production facilities and labor forces." [51] Jobs will be lost, physical assets sold, and commercial arrangements permanently altered. This is the sort of "scrambled eggs" that cannot be "unscrambled" through monetary damages.[52]

For the reasons stated above, Phototron has persuasively demonstrated the threat of irreparable harm if the proposed combination is not preliminarily enjoined.

### 3. Threatened Injury Verses the Damage of Injunctive Relief

Given the lengthy explication of its decision to grant injunctive relief, the Court will briefly address the remaining two elements required for the issuance of a preliminary injunction.

As noted above, the third required element is that the threatened injury to the movant outweigh any damage the injunction might cause the opponent. Here, this requirement poses little difficulty; Phototron has again met its burden of persuasion. The severe and potentially devastating injury threatened to competition in the wholesale photo finishing marketplace and to Phototron's ability to continue as a going concern far outweigh any damage that the injunction may cause the Defendants.

---

**47.** 15 U.S.C.A. § 26 (West Supp.1987).

**48.** *See, e.g., Interox America v. PPG Industries, Inc.,* 736 F.2d 194, 202 (5th Cir.1984); *Spiegel v. City Houston,* 636 F.2d 997, 1001 (5th Cir.1981).

**49.** *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (injunctive relief is available "even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust law or from a contemporary violation likely to continue or recur"); *Humana, Inc. v. Jacobson,* 804 F.2d 1390, 1394 (5th Cir.1986) (threatened loss of 50% of plaintiff's business entitled it to preliminary injunction).

**50.** *Compare International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 518 F.2d 913, 920–25 (9th Cir.1975) (no divestiture allowed) *with NBO Industries Treadway Cos. v. Brunswick Corp.,* 523 F.2d 262, 278–79 (3d Cir.1975), *vacated on other grounds,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (allowing divestiture).

**51.** Affidavit of William P. McCarrick at p. 4.

**52.** *See, e.g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) (irreparable injury present when businesses would be closed).

The interests of the Defendants will be adequately protected by Phototron's posting of security to cover any losses that may result from an improper delay of the combination. As noted below in the Court's Order, a hearing to determine the amount of the bond has already been scheduled.

### 4. Preliminary Injunction Will Not Disserve the Public

The fourth requirement for the issuance of a preliminary injunction has also been met by Phototron; namely, that the injunction will not disserve the public interest. Clearly, preserving competition is the underlying purpose of the federal antitrust laws.[53] The public has an interest in maintaining a free and open marketplace. In light of Phototron's prima facie showing of predation and antitrust jury here, this interest will be *preserved* by temporarily enjoining the proposed combination until the nature of the wholesale photo finishing market can be completely and fully examined.

### ORDER

For the reasons set forth fully above, the Defendants Kodak, Fuqua, and Colorcraft are PRELIMINARILY ENJOINED from consummating their agreement to combine the photo finishing operations of Kodak and Colorcraft. A hearing is set for 2:00 p.m., Tuesday, February 23, 1988, to determine the amount of security to be provided by Phototron pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

---

**53.** *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).