**Dan E. ROBERTS d/b/a ExpresTel, Appellant,**

v.

**Debra WHITFILL d/b/a Total Access Communication, Appellee.**

No. 10–04–00030–CV.

Court of Appeals of Texas, Waco.

March 22, 2006.

Richard G. Ferguson, Waco, for appellant.

Keith Bradley, Bradley & Cain, LLC, Cleburne, Leigh W. Davis, Fort Worth, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

Dan Roberts and Debra Whitfill were business partners in Cleburne. After their partnership dissolved and they became competitors, Whitfill sued Roberts for antitrust violations, fraud, and breach of fiduciary duty. Aided by a spoliation instruction, Whitfill prevailed before a jury, which found for her on all three claims and assessed damages of $110,000 in compensatory damages against Roberts and $50,000 in punitive damages. The damages were trebled, and along with attorney's fees, a judgment awarding over $750,000 in compensatory damages and $50,000 in punitive damages was entered by the trial court. We will reverse the judgment and render judgment that Whitfill take nothing on her antitrust claim and remand the cause to the trial court.

### Background

John Hayward, who is not a party to this appeal, had developed telecommunications software called "Superphone" that he was trying to market when he ran into Roberts, an old high-school friend, in 1997. They developed a plan to create a business that would provide various telecommunication services, including Superphone, which was a way for consumers to save on long distance charges. Using Superphone, a consumer in Cleburne could save money when making a long distance call—without incurring a long distance fee—to Dallas by calling a local number and entering some codes and the Dallas number. Depending on the number of calls made, the consumer would pay a monthly flat rate fee of $15 to $35, resulting in sizeable savings in long distance charges.

Roberts set up the business—ExpresTel—in the summer of 1997 to sell the Superphone service (among other services). He obtained a physical location in Cleburne, installed a computer and other hardware, and arranged and paid for telephone lines. Roberts and Hayward made an oral agreement: in exchange for allowing Roberts to use the Superphone software and for giving Roberts a forty-year exclusivity right in the North Texas area, Hayward was to receive fifty percent of ExpresTel's profits. Roberts hired Whitfill to market ExpresTel and to provide customer service, paying her a set-up fee for each new account she opened. In 1999, Hayward moved to California, and his percentage of profits was renegotiated to one-third because Roberts took over the technical troubleshooting that Hayward had previously done.

By 1999, Whitfill had become dissatisfied with her ExpresTel income and began exploring options with Hayward for a separate system. In March 2000, she obtained a lawyer, asserted that she was Roberts's partner instead of an ExpresTel employee, and demanded a partnership agreement. Roberts and Whitfill signed an Interim Standstill Agreement on March 10, 2000, after which Whitfill had no involvement with ExpresTel's operations.

Later in 2000, Whitfill sued Roberts, alleging that they were equal partners in ExpresTel and that Roberts had breached

their partnership agreement, breached his fiduciary duty, converted property, and defrauded her. Hayward got involved in settlement negotiations, making two proposals to Whitfill: (1) she would pay Hayward $7,500 (with a payout arrangement) to set up her own Superphone business on her computer with her own phone lines and be charged $4.50 per customer for the use of Superphone and Hayward's expertise; or (2) pay Hayward $7 per customer, have her business "hosted" through ExpresTel's computer and phone lines, and use Hayward's expertise. The second proposal would relieve Whitfill of equipment repairs and system failures and the need to obtain and negotiate phone line prices.

In November 2000, Roberts, Hayward, and Whitfill settled with the following key terms: (1) Roberts and Hayward waived Roberts's exclusivity for North Texas so that Whitfill could use Superphone in the same geographical area; (2) Roberts and Whitfill released all claims against each other; (3) Whitfill agreed to pay Roberts $22,500 for loans made in the course of their business arrangement; (4) Whitfill would get half (about 651) of ExpresTel's customers and compete with ExpresTel with her own Superphone business, Total Access, which would be hosted by ExpresTel's computer and phone lines; (5) Hayward would provide ExpresTel and Total Access with Superphone software and his expertise; (6) the cost of Roberts's phone lines would be shared by all three equally; and (7) Hayward's compensation would switch from a profit percentage to a monthly per-customer fee that he would charge Roberts and Whitfill separately. The settlement was essentially the second of Hayward's two proposals.

But about six weeks after the settlement agreement was signed, Whitfill amended her petition, adding claims for breach of the agreement and fraud in the induce-

ment of the agreement. The parties appeared to resolve the remaining differences, and Whitfill's suit was dismissed with prejudice. The parties signed a "Closing Agreement" that again released all claims between Whitfill and Roberts.

Whitfill began doing business as Total Access Communication in December 2000, and Roberts continued doing business as ExpresTel. Except for ExpresTel's hosting of Total Access, they were separate businesses. They had the same rates for customers at that time, although Roberts provided services other than Superphone to about 150 customers. Hayward's own business, HCS Telecom, leased Superphone software to ExpresTel and Total Access. HCS separately billed ExpresTel and Total Access each month. Whitfill paid HCS $7.00 per customer, and Roberts ultimately paid HCS $2 per customer. The $5 difference came from a $2.50 "hosting" fee collected from Whitfill as part of her $7.00 charge and credited by Hayward to Roberts off of his $4.50 charge to compensate Roberts for (1) the benefits to Hayward from Roberts's allowing Whitfill to use Roberts's system (because Hayward made money from Total Access through ExpresTel's hosting of Total Access), and (2) Roberts's maintaining the system (handling the phone lines and troubleshooting).

In other words, Hayward paid Roberts a $2.50 hosting fee so that Hayward could use Roberts's system for Whitfill and Total Access, but Hayward also charged Whitfill to recompense this expense. Without the $2.50 hosting fee, Roberts and Whitfill both would have been paying Hayward $4.50 per customer. Whitfill would later testify that, at the time of the settlement of the first lawsuit, she knew nothing of the $2.50 hosting fee, and that Hayward told her she and Roberts would pay the same charge per customer. The differ-

ence in charges was the principal basis of her second lawsuit.

By the early summer of 2001, Whitfill was dissatisfied with Total Access's revenue, so in June 2001, she severed her relationship with Roberts and ExpresTel, setting up Total Access on the computer and phone lines at Digitex. Her arrangement with Hayward was essentially the first proposal that he had made the year before: she would pay Hayward $7,500 (with a payout arrangement) to set up her own Superphone business on Digitex's computer and phone and be charged $4.50 per customer for the use of Superphone and Hayward's expertise. Hayward began billing Total Access $4.50 per customer, instead of $7.00, because the $2.50 hosting fee credit to Roberts was no longer justified as ExpresTel was no longer hosting Total Access. Whitfill was paying Digitex for that service.

Because Whitfill was still not making as much money as she expected in relation to ExpresTel, she became suspicious that she was being charged more per customer than ExpresTel was. In a May 2001 phone conversation with Hayward (which Whitfill secretly recorded), he made a statement that she believed indicated that Hayward and Roberts had previously agreed that she would pay $7.00 per customer; Whitfill testified that she had not known of this agreement, nor of what Hayward was charging Roberts per customer. She also had been unable to open the QuickBooks (ExpresTel's customer billing software program) data disks that she had gotten from Roberts in the settlement, and thus she could not ascertain the income and expense information between ExpresTel and Hayward.

Whitfill filed a second suit in August 2001, suing Roberts and Hayward and alleging state antitrust claims of preferential pricing and restraint of trade under the Texas Free Enterprise and Antitrust Act. *See* TEX. BUS. & COM.CODE ANN. § 15.01 *et seq.* (Vernon 2002). She also asserted claims for breach of the settlement agreement and for fraud and breach of fiduciary duty in negotiating the settlement.

The suit was tried on Whitfill's antitrust, fraud, and breach of fiduciary duty claims. The jury charge included a spoliation instruction that Roberts had intentionally destroyed QuickBooks data and the jury should presume the destroyed data was unfavorable to Roberts concerning Whitfill's damages, whether Roberts breached a fiduciary duty to Whitfill, and whether Roberts contracted to unreasonably restrain trade or commerce.

The jury answered the following questions pertinent to this appeal:

1. Roberts and Hayward contracted to create an unreasonable restraint on trade or commerce.

2. As a proximate result, Whitfill suffered injury in her business or property.

3. Roberts breached a fiduciary duty to Whitfill.

4. Hayward knowingly participated in Roberts's breach of fiduciary duty.

5. Roberts defrauded Whitfill.

6. Hayward defrauded Whitfill.

7. Whitfill's damages from Roberts's conduct referred to in Questions 2, 3, or 5 were $110,000.

8. Whitfill's damages from Hayward's conduct referred to in Questions 2, 4, or 6 were $60,000.

9. Whitfill's attorney's fees for Roberts's violation referred to in Question 2 were $79,000 at trial and $30,000 for appeals.

10. Roberts's conduct referred to in Question 1 was willful or flagrant.

11. Hayward's conduct referred to in Question 1 was willful or flagrant.

In a bifurcated proceeding, the jury answered the following questions:

16. Roberts's conduct referred to in Questions 3 or 5 was malicious.

17. Hayward's conduct referred to in Questions 4 or 6 was not malicious.

18. Exemplary damages should be assessed against Roberts for his actions referred to in Question 16.

20. Roberts should be assessed $50,000 in exemplary damages.

The trial court entered a judgment awarding Whitfill $758,264.19 in damages against Roberts and Hayward, jointly and severally. That amount was calculated by adding $170,000 in actual damages, $79,000 in attorney's fees, and $3,754.73 in court costs, and then trebling the sum. The judgment also awarded Whitfill $50,000 in exemplary damages against Roberts.

## Issues

Roberts appeals, asserting seven issues:

1. Whitfill lacks antitrust standing, and the trial court thus lacked subject matter jurisdiction to render a judgment for an antitrust violation.

2. The compensatory damages finding against Roberts fails because it combined damages for claims of antitrust, fraud, and breach of fiduciary duty, and because Whitfill lacks antitrust standing, the appellate court cannot determine how much of the compensatory damages are for fraud and breach of fiduciary duty.

3. The evidence of lost profits is legally insufficient.

4. The trial court erred by refusing to instruct the jury on the affirmative defenses of waiver and release.

5. If the antitrust damages award stands, the trial court erred in awarding exemplary damages.

6. The trial court erred in awarding damages against Roberts jointly and severally for the damages assessed against Hayward.

7. The trial court erred by giving the spoliation instruction in the charge.

## Analysis

### Antitrust Standing

Roberts asserts that Whitfill lacks antitrust standing because she did not suffer an antitrust injury and that the trial court thus lacked subject matter jurisdiction over Whitfill's antitrust claim. Whitfill responds that Roberts cannot raise antitrust standing for the first time on appeal and that, in any event, she has antitrust standing.

We are to construe the Texas Free Enterprise and Antitrust Act in harmony with federal judicial interpretations of comparable federal antitrust statutes. TEX. BUS. & COM.CODE ANN. § 15.04. We are also to construe the Act to accomplish its purpose, which is "to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." *Id.*

Antitrust standing is the initial inquiry in an antitrust case. *Maranatha Temple, Inc. v. Enterprise Products Co.,* 893 S.W.2d 92, 105 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (citing *Jayco Sys., Inc. v. Savin Business Machs. Corp.,* 777 F.2d 306, 313 (5th Cir.1985)); *Scott v. Galusha,* 890 S.W.2d 945, 950 (Tex.App.-Fort Worth 1994, writ denied) (citing *Bowen v. Wohl Shoe Co.,* 389 F.Supp. 572, 578 (S.D.Tex.1975)). "The issue of standing to bring an antitrust claim is a question of

law." *Maranatha*, 893 S.W.2d at 105 (citing *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir.1987)).

▮▮ A two-pronged test is used to examine whether a plaintiff has antitrust standing. *Scott*, 890 S.W.2d at 950 (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991)). First, the court should determine whether the plaintiff suffered an antitrust injury, and second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires analysis of the directness or remoteness of the plaintiff's injury. *Id.* (citing *Todorov*, 921 F.2d at 1449). Without suffering antitrust injury, a plaintiff lacks standing to sue. *Phototron Corp. v. Eastman Kodak*, 842 F.2d 95, 98 (5th Cir.1988).

▮▮ An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (holding that plaintiffs lacked standing because their damages resulted from increased competition, which is what the antitrust laws were enacted to protect, not prevent); *see also Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 539–46, 103 S.Ct. 897, 909–12, 74 L.Ed.2d 723 (1983) (holding that union lacked standing because it did not suffer antitrust injury). "The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. "The antitrust laws ... were enacted 'for the protection of *competition* not *competitors.*'" *Id.* at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)); *see Scott*, 890 S.W.2d at 950 ("An-

titrust laws are designed to protect competition rather than individual competitors."). Injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anticompetitive aspect of the practice under scrutiny, "since '[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986) (quoting *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697).

▮▮ The United States Supreme Court revisited antitrust injury in a 1990 case in which USA Petroleum complained that ARCO was engaging in antitrust practices by offering ARCO gas retailers discounts and allowances on wholesale gas prices so those retailers could compete more effectively with USA's gas retailers. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). The Court concluded that USA had not suffered an antitrust injury because ARCO had not engaged in predatory pricing (charging prices below costs to drive out competition), and "cutting prices in order to increase business often is the very essence of competition." *Id.* at 337–38, 110 S.Ct. at 1891 (quoting *Matsushita Elec. Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 594, 106 S.Ct. 1348, 1359, 89 L.Ed.2d 538 (1986)). The Court reiterated the difference between a violation of the antitrust laws and whether a particular plaintiff has suffered an antitrust injury as a result of that violation, including *per se* violations. *Id.* at 338–44, 110 S.Ct. at 1891–94. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.... [P]rocompetitive or efficiency-enhancing aspects of practices

that nominally violate the antitrust laws may cause serious harm to individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages." *Id.* at 343, 110 S.Ct. at 1894 (quoting Page, *The Scope of Liability for Antitrust Violations,* 37 Stan. L.Rev. 1445, 1460 (1985)).

▬▬▬▬ Whether antitrust standing, a specific type of standing, can be raised for the first time on appeal is an issue of first impression. We see no reason to differentiate it from standing in general, which may be raised for the first time on appeal.[1] It would be anomalous to allow a challenge to a plaintiff's standing to assert, for example, a constitutional claim for the first time on appeal, but not to allow a challenge to a plaintiff's standing to assert an antitrust claim. While it may be a better practice to first raise antitrust standing (and any other standing challenge) in the trial court, we hold that a challenge to a plaintiff's antitrust standing may be made for the first time on appeal.

▬▬▬▬ We next address whether Whitfill suffered an antitrust injury. "It is a well-established rule that a plaintiff does not have antitrust standing to prosecute an economic injury to himself unless that injury corresponds to an injury of the same type to the relevant market." *Scott,* 890 S.W.2d at 950 (citing *Anago, Inc. v. Tecnol Medical Prod., Inc.,* 976 F.2d 248, 249 (5th Cir.1992)). Whitfill pled that Roberts and Hayward had secretly agreed that Whitfill would be charged more per customer than Roberts. She alleged that this agreement significantly restrains trade because it provides preferential pricing to Roberts. She further alleged that it suppresses and destroys competition and has the effect of increasing prices. In her pleading, Whitfill asserted that the alleged agreement between Roberts and Hayward had the anticompetitive effects of (1) providing an unfair pricing advantage that prevents her from competing with Roberts and (2) depriving consumers of the benefits of competition in the long distance market. She further pled that she had lost customers to Roberts because he had offered them price incentives that she could not match due to the higher price that Hayward was charging her.

But the record is devoid of evidence on how the alleged misconduct and injuries correspond to an injury to consumers and competition in the relevant market. Whitfill testified that her only competition was ExpresTel, except in Tarrant and Dallas Counties. Only one other company did anything similar to Superphone, and at the time of trial, the market was slowing. Hayward testified that of the other two or three businesses in the Cleburne area offering similar service, none had software like Superphone. Digitex provided Superphone service for 50 to 100 customers in Whitney, and there was a competitor in Arlington. An ExpresTel employee testified that it had recently lost "quite a few" customers to Valor, another competitor.

Whitfill did not suffer an antitrust injury. She and Roberts, her alleged former partner, had a dispute, and when they divided their business, she did not make as

1. Standing is a component of subject matter jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445–46 (Tex. 1993). A party has standing if it has a justiciable interest in the suit or a personal stake in the controversy. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex.1996); *Tex. Ass'n of Bus.,* 852 S.W.2d at 444. Without standing, a court lacks subject matter jurisdiction to hear the case; thus, standing may be raised for the first time on appeal. *Austin Nursing Center, Inc. v. Lovato,* 171 S.W.3d 845, 849 (Tex. 2005) (citing *Tex. Ass'n of Bus.,* 852 S.W.2d at 443, 445).

much money as she expected because she paid the $2.50 hosting fee that was credited to Roberts for providing the hosting. *See Atlantic Richfield,* 495 U.S. at 338, 110 S.Ct. at 1891 (quoting *Cargill,* 479 U.S. at 116, 107 S.Ct. at 492 ("To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share.")). Irrespective of the merit of her fraud and breach of fiduciary duty claims, Whitfill's alleged injury is not an antitrust injury. *See Scott,* 890 S.W.2d at 950 (physician complaining of alleged antitrust conspiracy to exclude him from medical staff did not suffer antitrust injury); *see also Walker v. U–Haul Co. of Miss.,* 734 F.2d 1068 (5th Cir.1984) (plaintiff lacked standing because no antitrust injury shown but could maintain fraud and breach of fiduciary duty claims), *op. on reh'g,* 747 F.2d 1011 (5th Cir.1984).

Because Whitfill did not suffer an antitrust injury, she does not have antitrust standing, and the trial court lacked subject matter jurisdiction over her antitrust claim. We sustain Roberts's first issue, reverse the award of compensatory damages in the judgment (because it is premised on trebling of actual damages, costs, and attorney's fees), and render judgment that Whitfill take nothing on her antitrust claim.

*Compensatory Damages*

In his second issue, Roberts asserts that because Whitfill lacks antitrust standing and because the trial court erred in the way it submitted Question 7, the compensatory damages award in the judgment must be set aside and reversed and the cause remanded for a new trial on Whitfill's fraud and breach of fiduciary duty claims.

Dena Day, Whitfill's damages expert, calculated her actual damages to be $168,663.32. The jury answered one compensatory damages question (7) as to Roberts and one compensatory damages question (8) as to Hayward. Question 7 asked the jury to determine Whitfill's damages, if any "that resulted from the conduct of Roberts, if any, as found by you in Questions 2 [antitrust], 3 [breach of fiduciary duty] *or* 5 [fraud]." (Emphasis added). The jury was instructed to include an allowance for lost profits in considering damages arising from the antitrust claim and not to include an allowance for lost profits in considering damages arising from the breach of fiduciary duty and fraud claims. Instructions from the Texas Pattern Jury Charges on damages for fraud and breach of fiduciary duty were not used. The jury answered $110,000 in Question 7 and $60,000 in Question 8, the identical damages question as to Hayward's conduct.

In response to Whitfill's assertion that Roberts failed to preserve his complaint by not sufficiently and specifically objecting, we find that Roberts adequately objected to Question 7. *See Dallas Mkt. Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 387 (Tex. 1997), *overruled in part on other grounds by Torrington Co. v. Stutzman,* 46 S.W.3d 829 (Tex.2000); *State Dep't Hwys. & Pub. Transp. v. Payne,* 838 S.W.2d 235, 239–41 (Tex.1992). Roberts did object, stating that there should be separate damage questions for the antitrust claim and for the fraud and breach of fiduciary duty claim because lost profits were recoverable only on the antitrust claim and other damages might be recoverable under any of the three claims.

█ In the charge, the trial court specifically instructed the jury not to consider lost profits as a damages element for fraud and breach of fiduciary duty, but only for

the antitrust claim. The jury was also instructed not to reduce damages by the amount of damages found separately against the other defendant. The jury found that $110,000 in damages resulted from Roberts's conduct and that $60,000 resulted from Hayward's conduct, for a total of $170,000, which closely approximates Day's damage calculation of $168,663.32. Day's calculation was broken down into fourteen categories (several of which were for "lost revenue"), and we agree with Roberts that the jury's answers of $110,000 and $60,000 cannot be explained (Whitfill offers no explanation).

More importantly, we cannot determine whether the jury awarded all or part of the $110,000 against Roberts as lost profits on the antitrust claim. Some of it plainly was, as Day's calculations included "lost revenue," and at the charge conference, in response to Roberts's counsel's objection to Question 7, Whitfill's counsel admitted that Day's damages calculation included lost profits. We therefore necessarily cannot determine a specific amount of compensatory damages against Roberts on Whitfill's fraud and breach of fiduciary duty claims.

■ When a damages question mixes valid and invalid elements of damages in a single, broad-form submission and the defendant adequately and correctly objected, harmful error occurs because the appellate court cannot determine whether the jury based its verdict on an invalid or improperly submitted damage element. *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002); TEX.R.APP. P. 61.1(b); *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex.2000) (finding harmful error where single liability question mixed valid and invalid theories of recovery and defendant properly objected). The trial court erred in overruling Roberts's objection to Question 7, and that error is harmful be-

cause in this appeal we are prevented from "unmixing" the compensatory damages and determining the amount of compensatory damages against Roberts on Whitfill's fraud and breach of fiduciary duty claims.

We sustain Roberts's second issue and reverse the judgment's award of compensatory damages as to Roberts and remand the cause for a new trial on Whitfill's fraud and breach of fiduciary duty claims. Furthermore, the judgment award of $50,000 in exemplary damages against Roberts must be reversed because exemplary damages are not recoverable without compensatory damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.004(a) (Vernon Supp. 2005) ("exemplary damages may be awarded only if damages other than nominal damages are awarded"); *Juliette Fowler Homes v. Welch Assocs.*, 793 S.W.2d 660, 667 (Tex.1990) ("Recovery of actual damages is a prerequisite to the receipt of exemplary damages.").

Because of our disposition, we need not address issues 3, 5, and 6, but we will address issues 4 and 7, which will likely arise in a retrial of this cause. *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex.1997); *In re J.B.*, 93 S.W.3d 609, 617 (Tex.App.-Waco 2002, pet. denied).

*Submission of Affirmative Defenses of Waiver and Release*

■ Issue 4 complains of the trial court's refusal to submit a question on Roberts's affirmative defenses of release and waiver, which he pled. We review a trial court's decision to submit or refuse a particular question or instruction under an abuse-of-discretion standard. *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Byrd v. Estate of Nelms*, 154 S.W.3d 149, 160 (Tex.App.-Waco 2004, pet. denied). A trial court is required to submit questions and instructions that are raised by the pleadings and

evidence. Tex.R. Civ. P. 278. The trial court has broad discretion in submitting jury questions and instructions. *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995). "Failure to submit a question shall not be deemed a ground for reversal of the judgment unless a substantially correct question has been requested in writing and tendered by the party complaining of the judgment." [2] Tex.R. Civ. P. 278. When a trial court refuses to submit a proper question or instruction, reversal is not required unless the error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 170 (Tex.2002).

■ Roberts's release and waiver defenses were based on the settlement agreement and the closing agreement in connection with the first lawsuit. Each agreement had identical release language: Whitfill "release[d] and forever discharge[d] [Roberts] ... of and from all claims, ... causes of action, ... and liabilities whatsoever ... which she ever had, now has, or which she hereafter can, shall or may have against [Roberts], for or by reason of any matter, cause or thing whatsoever occurring prior to the date of this instrument...." On appeal, the parties vigorously dispute the evidence that Whitfill knew or suspected that Roberts was defrauding her (by the alleged secret agreement that she would be charged more by Hayward) when she signed the two agreements. This disputed evidence not only raised the defenses of release and waiver, but it demonstrates a fact issue exists that a jury should determine. The trial court erred in refusing to submit Roberts's question.

*Spoliation Instruction*

In discovery, Whitfill had requested that Roberts produce the original and any copies of ExpresTel's QuickBooks data for January 1, 2000 through November 29, 2001, and when he did not produce the data at his deposition, Whitfill filed a motion to compel and for sanctions, which the trial court heard in September 2002.

At the hearing, an ExpresTel employee testified that ExpresTel's QuickBooks program had "crashed" the year before and that only ExpresTel customer data was reentered; no Total Access customer data was reentered. Roberts testified that he had started removing QuickBooks data about Total Access customers in Novem-

---

2. Roberts submitted the following question and instructions:

> Do you find that Debra Whitfill waived and/or released Dan E. Roberts from her claim of fraud in the inducement and breach of fiduciary duty?
> Release is a contractual surrender by one party of its cause of action against the other party. A release extinguishes a claim or cause of action and bars recovery on the released claim.
> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.
> A release and a waiver are not valid if either is procured by fraud.
> Fraud occurs when—
> a. a party makes a material misrepresentation,
> b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
> c. the misrepresentation is made with the intention that it should be acted on by the other party, and
> d. the other party acts in reliance on the misrepresentation and thereby suffers injury.
> Answer:_____

This question, which includes Whitfill's matter of avoidance (fraud in the inducement), is substantially correct. *See, e.g., Lemaire v. Davis,* 79 S.W.3d 592, 596–97 (Tex. App.-Amarillo 2002, pet. denied) (trial court submitted defense of release with instruction that fraud invalidated release).

ber 2001, a few months after Whitfill filed the present lawsuit and just after he had been served with a subpoena duces tecum requesting the QuickBooks data. Roberts had supplied QuickBooks data twice in the first lawsuit, he had a paper copy of customer names, and he explained that he could print specific reports from Quick-Books such as accounts receivables, sales reports, customer invoices, "a multitude of things." He also said that printing his current QuickBooks data would include ExpresTel's new customers, which Roberts did not want to produce.

The hearing recessed without a ruling and was never resumed. The trial court never ordered Roberts to produce the QuickBooks data. Based on Roberts's testimony that he deleted Total Access customer data after being served with the subpoena duces tecum, the trial court, over Roberts's objection, included the following spoliation instruction, which Whitfill's attorney strongly emphasized in closing argument:

> You are instructed that Dan Roberts has intentionally destroyed QuickBooks data. You are further instructed that you should presume that the Quick-Books data destroyed was unfavorable to Dan Roberts concerning the damages suffered by Whitfill. You are further instructed that you should presume that the QuickBooks data destroyed was unfavorable to Dan Roberts concerning whether he breached a fiduciary duty owed to Whitfill. You are further instructed that you should presume that the QuickBooks data destroyed was unfavorable to Dan Roberts concerning whether he contracted to unreasonably restrain trade or commerce. You are further instructed that Dan Roberts bears the burden to disprove these presumptions.

Roberts asserts in issue 7 that the trial court committed harmful error in giving the spoliation instruction. Because we are already reversing the judgment and remanding this cause, and because the record on this issue is not fully developed, we will not rule on it. But we will discuss the spoliation instruction to guide the trial court and the parties on remand, beginning with the Texas Supreme Court's most recent spoliation discussion:

> Evidence may be unavailable for discovery and trial for a variety of reasons. Evidence may be lost, altered or destroyed willfully and in bad faith or it may be lost for reasons completely innocent. Sometimes, lost evidence may be easily replicated, or it may be so marginal that it has little or no effect on the outcome of the case. On other occasions, the loss or destruction of evidence may seriously impair a party's ability to present its case. A trial judge should have discretion to fashion an appropriate remedy to restore the parties to a rough approximation of their positions if all evidence were available. These remedies must generally be fashioned on a case-by-case basis.

> . . .

> Our courts of appeals have generally limited the use of the spoliation instruction to two circumstances: [1] the deliberate destruction of relevant evidence and [2] the failure of a party to produce relevant evidence or to explain its nonproduction. Under the first circumstance, a party who has deliberately destroyed evidence is presumed to have done so because the evidence was unfavorable to its case. Under the second, the presumption arises because the party controlling the missing evidence cannot explain its failure to produce it.

> . . .

Before any failure to produce material evidence may be viewed as discovery abuse, the opposing party must establish that the non-producing party had a duty to preserve the evidence in question. Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim.

*Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 721–22 (Tex.2003) (citations omitted).

 In this case, while we do not decide whether a spoliation instruction was proper, we note several concerns. First, Whitfill did not pursue her motion to compel and obtain an order requiring Roberts to produce whatever ExpresTel Quick-Books data existed.[3] We thus express

some doubt about the materiality and relevance of that data overall and whether the deleted data—Total Access's customer data—seriously impaired Whitfill's ability to present her case. Because of the comprehensive severity of the spoliation instruction, Whitfill's failure to pursue the ExpresTel QuickBooks data gives us pause. Connected to that concern is the absence of an explanation of the materiality and relevance of the data and how or even if its absence seriously impaired Whitfill's ability to present her case. Furthermore, Roberts provided an explanation for the data's removal from his computer and offered to produce at least some of the data in paper form and explained how he could print specific reports. Finally, based on the above circumstances surrounding the data at issue and a review of spoliation instructions recently approved by Texas courts,[4] the comprehensive severity of the

---

3. The failure to pursue the motion to compel to a ruling raises the issue whether a sanction such as a spoliation instruction was warranted; "the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct." *Remington Arms Co. v. Caldwell,* 850 S.W.2d 167, 170 (Tex.1993); *see generally Trevino v. Ortega,* 969 S.W.2d 950, 958–61 (Tex.1998) (Baker, J., concurring) (discussing various sanctions for evidence spoliation, including giving jury spoliation instruction). If neither party asks for a hearing [on the objections], the party who sent the request for discovery waives the requested discovery." Michol O'Connor, O'Connor's Texas Rules ^ Civil Trials 341 (Michol O'Connor Byron P. Davis eds., 2005).

4. The following spoliation instructions were approved:

You are instructed that if there is evidence that is pertinent to the issues in this cause, which was in the exclusive possession and control of a party and which cannot be produced, and its disappearance or non-production has not been satisfactorily explained, then you may consider that such evidence contained information adverse to

the position taken by the party who was in the possession.

*Texas Elec. Cooperative v. Dillard,* 171 S.W.3d 201, 208 (Tex.App.-Tyler 2005, no pet. h.)

You are instructed that, when a party has possession of a piece of evidence at a time he knows or should have known it will be evidence in a controversy, and thereafter he disposes of it, alters it, makes it unavailable, or fails to produce it, there is a presumption in law that the piece of evidence, had it been produced, would have been unfavorable to the party who did not produce it. If you find by a preponderance of the evidence that Cresthaven Nursing Residence had possession of original, unaltered nurses notes pertaining to Wanda Granger at a time it knew or should have known they would be evidence in this controversy, then there is a presumption that the original, unaltered nurses notes pertaining to Wanda Granger, if produced, would be unfavorable to Cresthaven Nursing Residence. This presumption may be rebutted by Cresthaven Nursing Residence with the evidence of a reasonable explanation for the non-production of the evidence.

*Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214, 225 (Tex.App.-Amarillo 2003, no pet.).

spoliation instruction that was given in this case appears excessive. Based on the limited record before us, a less severe spoliation instruction would appear appropriate if the proper predicate is laid. *See Trevino,* 969 S.W.2d at 960–61 (Baker, J., concurring) (discussing the two spoliation presumptions—severe and less severe—and their application).

### Conclusion

We reverse the trial court's judgment, render judgment that Whitfill take nothing on her antitrust claim, and remand the cause to the trial court for proceedings consistent with this opinion.

Chief Justice GRAY concurs in only the judgment of the Court without a separate opinion.